THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRANK C. ALERTE, JR., Defendant-Appellant.

First District (3rd Division)   No. 81—389

Opinion filed December 30, 1983.

James J. Doherty, Public Defender, of Chicago (Ronald P. Alwin, Kathleen M. O'Leary, and Kathleen McGinnis, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Anthony John Calabrese, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant, Frank C. Alerte, Jr., was found guilty of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) and sentenced to 30 years in the Illinois State Penitentiary. On appeal defendant argues that (1) the State failed to prove beyond a reasonable doubt that he was sane at the time of the stabbing, (2) the prosecutors' arguments to the jury deprived him of a fair trial, (3) the court erred in refusing to instruct the jury on the consequences of a verdict of not guilty by reason of insanity and (4) the court erred in denying his request for a bifurcated trial or separate juries on the issues of guilt and sanity. We affirm.

The evidence showed that at approximately 6:45 p.m. on January

12, 1980, two men ran across a field toward the dormitory of a local university. The pair then stood near the entrance of the dorm. One of them supported the other, who was leaning against the wall. A student who passed by asked what was going on and one of the men, who was identified as defendant, said something like, "he's just drunk, he'll get over it." Defendant pulled the other man toward nearby bushes and laid him down. The student noticed that the man on the ground, the victim, had a cut on his neck, and the student called the university security. When another student asked defendant to help carry the victim inside, defendant, who was coherent and rather calm, said that maybe they shouldn't move him because they might hurt him. Shortly thereafter, defendant was seen walking quickly from the dorm with his left hand pushing something that appeared to be a weapon into his pants pocket. The victim died of multiple stab wounds of the chest and back.

Later that night, Chicago police officers picked up defendant at his parents' home. On the way to the police station, defendant stated that he had been with the victim until 7 that evening, and defendant conversed about his position as manager of the university's tennis team. According to the assistant State's Attorney who questioned defendant that night, defendant responded in a coherent and intelligent manner, relating events of the day in great detail. An officer who also questioned defendant testified that defendant said that he had been with the victim that day and that they had watched TV and played ping pong at the dormitory until 6 or 6:30 p.m. The victim was walking defendant to the el station when the victim said he forgot something at the dorm and went back. Defendant waited 10 or 15 minutes, then walked back to the dorm and saw the victim leaning against the door. Defendant tried to hold him up. Defendant stayed until a group of people came. He then went home.

According to defendant's mother, defendant had behavior problems which resulted in referrals to psychologists and child psychiatrists, expulsion from various schools and periods of hospitalization. She recalled specific incidents when defendant struck a student with a rock, hit a neighbor's son with a hammer, ran away from home, set fire to his house, attacked a young man on a train platform and struck a co-worker over the head with an iron pipe. His mother described defendant just before and after two of these incidents as a different person, extremely quiet, with a certain staring expression. A woman who took care of defendant's brother testified that once when she reprimanded defendant for teasing his brother, defendant responded by dropping grapes down her back. Then, when she went to

phone defendant's father, defendant stuck a knife in her back. The woman also testified that she thought defendant was not well but she did not think he was crazy. Several other witnesses testified about incidents when defendant behaved violently or aggressively and seemed like a different person, his facial expression completely changed, his strength doubled, showing no remorse and offering no explanation. One of defendant's former teachers testified that defendant seemed to turn on those classmates he liked best.

The university's tennis coach and a tennis instructor testified to the apparently normal relationship between the victim and defendant during the two days before the occurrence. A university student testified that on the afternoon of January 12, 1980, he was playing ping pong with the victim in the dormitory. He saw defendant standing, then pacing, outside with an envelope or papers in his hand. Defendant walked in and sat down without saying hello and began looking through the papers with a pensive expression, as if he had something on his mind. The student then left.

Dr. Fredric A. Gibbs, an expert in the field of epilepsy and electroencephalography, testified that he first met defendant in 1965. At that time, Gibbs administered and read defendant's EEG, which was abnormal, revealing a type of seizure activity in part of the brain. Gibbs stated that this type of abnormality does not produce convulsions, but 2% of the people with this abnormality have rage attacks during which they cannot control their actions or exercise normal judgment. Based on defendant's EEG and history, Gibbs believed defendant suffered from this condition. A 1969 EEG of defendant showed some improvement, but on that day defendant suddenly grabbed Gibbs' necktie and, with a display of unusual strength, started dragging Gibbs toward an open window. A friend of Gibbs' who was present grabbed defendant and helped quiet him down. Gibbs believes that this incident was a rage attack. According to Gibbs, epileptics and people who have rage attacks can have normal EEG's. Following a normal EEG of defendant in 1977, Gibbs referred defendant to Dr. Frank Lorimer.

Dr. Lorimer testified that he is a psychiatrist who had examined defendant on three occasions since the occurrence. He concluded, on the basis of those examinations, an interview with defendant's family, and defendant's medical records, that defendant best classifies diagnostically as having organic brain syndrome, nonpsychotic with epilepsy. According to Lorimer, defendant's form of epilepsy is limbic epilepsy, a category of epilepsy now gaining medical recognition, which is characterized by rage attacks and blackouts. Normal EEG's would

not be contrary to a diagnosis of epilepsy. Lorimer also testified that on January 12, 1980, defendant's condition of organic brain syndrome was in a psychotic phase because defendant was in a distinct rage attack at that time. Further, Lorimer testified that defendant was then unable to appreciate the criminality of his behavior or conform to the requirements of the law.

In rebuttal, Dr. John Hughes, a specialist in electroencephalography and epileptology, testified that he reviewed EEG's of defendant and found four early EEG's to be somewhat abnormal and 10 subsequent EEG's, including one considered abnormal by Gibbs, to be normal. According to Hughes, the pattern that Gibbs considered abnormal represented only drowsiness, not an abnormality. Hughes believes that it is impossible for an epileptic to have such a series of EEG's. Hughes also testified that Lorimer's diagnosis of organic brain syndrome nonpsychotic with epilepsy does not appear in the manual containing acceptable diagnoses in the field of psychiatry. Further, Hughes testified that limbic epilepsy is not a term that is commonly understood and agreed upon by the world neurological community. Psychomotor seizures that fall under the classification of partial seizures with complex symptomatology are the closest things to limbic epilepsy which are medically recognized. In response to a hypothetical question, Hughes testified that activities such as those of defendant on January 12, 1980, could not have been the result of a psychomotor seizure since they were clearly directed and purposive.

Dr. Robert Reifman, a psychiatrist, testified that on the basis of his personal interviews with defendant and his examination of defendant's medical records, he concluded that defendant did not suffer from any mental disease or defect on January 12, 1980, and that defendant could appreciate the criminality of his conduct and was capable of conforming his conduct to the requirements of the law. Reifman diagnosed defendant as having a narcissistic personality, a diagnosis which is consistent with problems in school and violent episodes. Reifman also testified that Gibbs, having read an EEG which Reifman administered to defendant, wrote a letter which stated that the activity manifested in the EEG is not associated with mild or severe behavior disturbance.

The jury found defendant guilty of murder.

Defendant first contends that the State did not prove beyond a reasonable doubt that he was sane at the time of the stabbing. Specifically, defendant argues that the State did not prove beyond a reasonable doubt that the stabbing was not the result of defendant's particular kind of epilepsy, a mental disease or defect which manifests itself

in violent rage attacks during which defendant neither knows what he is doing nor has the capacity to control his conduct. We disagree.

■ Once a defendant introduces sufficient evidence to create a reasonable doubt as to his sanity at the time of the offense, the burden of going forward with the evidence on that issue shifts to the State. (See *People v. Foster* (1979), 76 Ill. 2d 365, 378-79, 392 N.E.2d 6, 12. But see Pub. Act 83—288 (1983 Ill. Laws 1713—14), amending Ill. Rev. Stat. 1981, ch. 38, pars. 3—2, 6—2 (which, effective January 1, 1984, changes the burden of proof when the affirmative defense of insanity is raised).) Whether the State has met its burden of proving beyond a reasonable doubt that the defendant was sane at the time is a question of fact. The fact-finder's decision will not be disturbed on review unless it is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's sanity or is so palpably erroneous as to suggest that it is based upon passion or prejudice. *People v. Clark* (1981), 102 Ill. App. 3d 414, 418, 429 N.E.2d 1255, 1258.

Here, the record reveals that the jury's decision as to defendant's sanity was not improbable, unsatisfactory or palpably erroneous. Both State and defense experts testified that some of defendant's EEG's were abnormal and some were normal. The experts drew conflicting conclusions from their readings of one of the 1980 EEG's. Gibbs considered the EEG abnormal, while Hughes considered the pattern to be the result of drowsiness, not abnormality. The experts disagreed with regard to the significance of the normal EEG's. Lorimer believed that normal EEG's would not be contrary to a diagnosis of epilepsy, yet Hughes believed it impossible for an epileptic to have such a series of EEG's. Further, the experts disagreed in their diagnosis of defendant. Lorimer diagnosed defendant as having organic brain syndrome, with limbic epilepsy, which was in a psychotic phase at the time of the victim's death, a diagnosis which is not among the possible diagnoses which appear in the diagnostic and statistical manual of the American Psychiatric Association. Reifman diagnosed defendant as having a narcissistic personality, not a mental disease or defect. Either condition could account for defendant's actions on January 12, 1980, and on the other occasions when he behaved violently. It is within the discretion of the trier of fact to accept one expert's opinion over another's on the question of insanity so as to resolve contradictions. (See *People v. Clark* (1981), 102 Ill. App. 3d 414, 421, 429 N.E.2d 1255, 1260.) We believe that the State's expert testimony, which the jury apparently chose to accept, together with the unconflicting testimony regarding defendant's calm and coherent behavior shortly before and after the victim's death, sufficiently support the ju-

ry's determination that defendant was sane at the time of the crime.

■ Next, defendant argues that the prosecutors' improper and prejudicial remarks to the jury deprived him of a fair trial. The remarks were made during closing and rebuttal arguments, which were presented by different prosecutors. Defendant maintains that as a whole the prosecutors' arguments manifested a deliberate attempt to prejudice and inflame the jury and to divert the jurors' attention from the issue of defendant's sanity. Defendant specifies various remarks which he contends were improper, including: (1) remarks about the family of the victim, (2) remarks about defendant's parents, (3) a plea for sympathy for the victim, (4) statements that the defense was a fraud, (5) attacks on the integrity of defense counsel, (6) expressions of the prosecutors' personal opinions, (7) suggestions that defendant's motives related to homosexuality and (8) remarks about the results of a not-guilty verdict. We have examined the record carefully and, while we believe that some of the prosecutors' remarks were improper, we do not believe that the remarks constituted a material factor in the conviction or resulted in substantial prejudice to defendant.

Defendant argues that no reasonable and fair-minded juror could react rationally and dispassionately to the prosecutors' references to the family of the victim during closing argument and rebuttal. We note that these comments passed without objection by defendant, and they were not specified in defendant's motion for a new trial. Therefore, any error is waived. Moreover, while it is improper for a prosecutor to refer to the family of a murder victim either by evidence or argument (see *People v. Starks* (1983), 116 Ill. App. 3d 384, 389, 451 N.E.2d 1298, 1302), every mention of a deceased's family does not necessarily, in and of itself, entitle the defendant to a new trial. (See *People v. Bartall* (1983), 98 Ill. 2d 294, 322, 456 N.E.2d 59.) Common sense tells us that murder victims do not live in a vacuum and in most cases leave family members behind. (*People v. Free* (1983), 94 Ill. 2d 378, 415, 447 N.E.2d 218, 236.) Here, the jury heard the victim's mother testify regarding her son's life and death. We do not believe that the prosecutors' remarks emphasized the loss to the family to the extent that the jury would, on the basis of those remarks, disregard any evidence which might be favorable to defendant. Thus, we do not believe that the jury's verdict would have been different had the remarks not been made. Since the jury heard sufficient evidence to find that defendant was sane and that he was guilty beyond a reasonable doubt, we believe any error would have been harmless.

■ Defendant also complains of what he characterizes as devastating personal attacks on his family by the prosecutors which consti-

tuted expressions of the prosecutors' personal opinions and argument of matters unsupported by the evidence. Specifically, the prosecutor in rebuttal argued that "[t]here should be two more chairs seated right next to that guy [defendant], and that's for his parents. They should be on trial here, too, because it was them, along with him, that caused the death of [the victim] \*\*\*." The court ruled that this was fair comment. The prosecutor further stated:

> "You heard all about his [defendant's] life. Thank God you did, because you know how not to raise your kids. \*\*\* We have learned that if you raise your kids like [defendant's parents] did, they're going to kill somebody some day. If you give them everything they want, if you don't want to deal with their problems, \*\*\* if you want to just send them to other people, some day you may have a killer on your hands."

The court overruled defendant's objection to these remarks. The State maintains that these and other references to defendant's parents' childrearing practices were proper expressions of the evidence which showed that defendant's parents spoiled him and did not discipline him properly, and of the reasonable inference from the evidence that the cause of defendant's violent behavior was not organic but social. We believe that the evidence did provide some basis for these remarks and that the jury's verdict was not affected by the remarks.

■ Defendant also points to the prosecutor's plea for sympathy for the victim as an example of an improper and prejudicial remark. Although defendant objected to this part of the argument, the record does not indicate that the court ruled on the objection. While we believe that a plea for sympathy for the victim is improper, we do not believe that the remark here was a factor in defendant's conviction.

■ Next, defendant argues that he was prejudiced by the prosecutor's comments that the jury should not be "hoodwinked by somebody's past medical history" and that "it's a fraud what they are doing." Defendant did not object to either comment, so any error is waived. Regardless of waiver, we do not believe that these comments affected the jury's verdict under the circumstances in this case.

■ Defendant further argues that he was prejudiced by the prosecutor's improper attacks on the integrity of defense counsel, specifically, the prosecutor's statement that defense counsel took the case for money. We believe that defendant's objection to this comment was properly overruled. While it is improper for a prosecutor to suggest that the only reason defense counsel represented a defendant was to receive a fee (*People v. Williams* (1981), 99 Ill. App. 3d 919, 924, 425 N.E.2d 1321, 1325), the prosecutor's comment here was made during

rebuttal in direct response to defense counsel's comment that "the trial and this system does let the truth come out, and that's what I swore I would do. That was the only way I would take this case." Comments by the prosecutor which might ordinarily be improper may be proper in rebuttal when they are an invited reply to improper comments by defense counsel in his own closing argument. See *People v. Sutton* (1977), 45 Ill. App. 3d 739, 742, 359 N.E.2d 1132, 1134.

■ Defendant also contends that the prosecutors improperly and prejudicially expressed their personal opinions about defendant and a defense witness and about the insanity defense in general, and verbally abused defense counsel. Some of these comments were made without objection and objections to others were overruled. Although we believe that some of the comments were impermissible expressions of the personal feelings and experiences of the prosecutors, we do not believe that they were the kind of direct expressions of the prosecutors' personal opinions as to defendant's guilt or the witness' credibility which would require a new trial. See *People v. Monroe* (1977), 66 Ill. 2d 317, 323-24, 362 N.E.2d 295, 298.

■ Next, defendant argues that the prosecutor improperly and prejudicially implied that the murder here was motivated by defendant's homosexuality when there was no evidence of homosexuality at trial. The court overruled defendant's objection to the following:

> "[Assistant State's Attorney]: You know that he played tennis at the [tennis club], and who paid? Who paid for [the victim's] tennis? Him [defendant]. Now, you can draw any inference you want from that, too, and I'll tell you something else, and [the other assistant State's Attorney] already told you that we don't have to prove a motive, because I cannot get inside that man's vicious mind and tell you what happened when he and [the victim] left [the dormitory] and he decided something about [the victim], something that [the victim] said or something that he wanted to do that [the victim] wouldn't go along with—."

A further reference to which defendant points was made without objection and was not mentioned in defendant's motion for a new trial. While we do not approve of the prosecutor's comments, we do not believe that the verdict would have been different had the comments not been made.

■ Finally, defendant contends that the prosecutors prejudiced defendant by making improper comments which suggested that defendant would "skate," "get a slap on the wrist" or "walk out of this courtroom and *** scoff at all of us" if found not guilty by rea-

son of insanity. Defendant maintains that these comments actually misrepresented the result of a not-guilty-by-reason-of-insanity verdict in Illinois, and they could only make a juror strongly inclined to convict out of fear that defendant would be set free. We agree that these remarks were improper since the jury is not to consider the consequences of its verdict. (See *People v. Meeker* (1980), 86 Ill. App. 3d 162, 170, 407 N.E.2d 1058, 1065.) However, since the prosecutors did not directly call upon the jury to convict defendant even though it might believe defendant insane, we do not believe that the comments here constituted the type of violation which requires a new trial. (See *United States v. Jackson* (7th Cir. 1976), 542 F.2d 403, 411-12.) Although defendant contends that this is a close case on the issue of insanity, we do not agree. The record reveals a substantial basis for supporting the verdict. Thus, we do not believe that the jury's verdict would have been different had the comments not been made.

While it is clear that some of the prosecutors' remarks in this case were improper, we have carefully examined the whole record, and we are convinced that they did not prevent defendant from receiving a fair trial. However, we do not condone the misconduct here simply because we have concluded that the misconduct did not deny defendant a fair trial. See *People v. Starks* (1983), 116 Ill. App. 3d 384, 396, 451 N.E.2d 1298, 1306.

■■■ Next, defendant contends that the court erred in refusing to instruct the jury on the consequences of a verdict of not guilty by reason of insanity. During the instruction conference, defendant tendered an instruction containing language taken verbatim from the statute which sets forth the procedures to be followed after acquittal by reason of insanity. (See Ill. Rev. Stat. 1979, ch. 38, par. 1005–2–4(a), (b).) The court refused the instruction and stated that it did not think that defendant was entitled to such an instruction under current law. We believe that the court properly refused the instruction.

In *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058, this court declined to adopt as a general rule of law a requirement that the jury be given an instruction which relates the consequences of a verdict of not guilty by reason of insanity. The *Meeker* court noted that the vast majority of jurisdictions do not permit such an instruction because of the general rule that the jury is to consider only its verdict and not the consequences of its verdict. (86 Ill. App. 3d 162, 170, 407 N.E.2d 1058, 1065.) However, the *Meeker* court did not decide whether special circumstances in a given case might warrant such an instruction, and, as an example of the recognition of special circumstances, the *Meeker* court cited an Indiana case in which the

prosecutor argued to the jury that the defendant would be set free if found not guilty by reason of insanity. 86 Ill. App. 3d 162, 171, 407 N.E.2d 1058, 1066, citing *Malo v. State* (1977), 266 Ind. 157, 361 N.E.2d 1201.

More recently, in *People v. Hebein* (1982), 111 Ill. App. 3d 830, 444 N.E.2d 782, the court considered the applicability of a special circumstances exception requiring an instruction regarding the consequences of a verdict of not·guilty by reason of insanity. The *Hebein* court noted that in Indiana, the exception has been narrowly construed to apply only where there is a direct comment on the consequences of a verdict of not guilty by reason of insanity. (111 Ill. App. 3d 830, 838, 444 N.E.2d 782, 789.) Thus, the *Hebein* court determined that even if it were to adopt the exception, the narrow parameters of the exception would not encompass the situation in that case. (111 Ill. App. 3d 830, 839, 444 N.E.2d 782, 790.) Further, the *Hebein* court noted that the failure to give the instruction even where there are special circumstances would be harmless error unless there is a reasonable possibility that the error might have contributed to the jury's finding. 111 Ill. App. 3d 830, 839-40, 444 N.E.2d 782, 790.

Here, defendant contends that special circumstances existed because the prosecutor argued as follows:

"[Assistant State's Attorney]: *** You decide. Are we going to let Frank Alert skate? Are we going to let him get a slap on the wrist again and walk out of this courtroom and—

[Defense counsel]: Objection.

[Assistant State's Attorney]: (Continuing) — and scoff at all of us?

The Court: Punishment is left up to me.

[Assistant State's Attorney]: *** We are going to slap him on the wrist and let him walk out because of somebody like Frank Lorimer?"

We do not believe that the prosecutor's comments were the kind of comments on the consequences of the not-guilty-by-reason-of-insanity verdict which would require an instruction on the consequences. Furthermore, the jury heard the court remark that punishment is left up to the court. Under the circumstances, we believe that any error in this regard was harmless.

Finally, defendant argues that the court erred in denying his request for a bifurcated trial or separate juries on the issues of guilt and sanity. Defendant contends that he was prejudiced on the question of guilt or innocence because the evidence supporting his insanity defense necessarily included evidence of his previous violent acts from

which the jury would conclude that defendant stabbed the victim to death. We disagree.

■■■ As defendant acknowledges, a bifurcated trial is neither constitutionally mandated nor statutorily authorized. (See *People v. Robinson* (1981), 102 Ill. App. 3d 884, 889-90, 429 N.E.2d 1356, 1361.) Defendant argues, however, that bifurcated proceedings are not statutorily prohibited, and the court may exercise its supervisory power and allow bifurcated proceedings in order to avoid prejudice. While we recognize the conflicts inherent in deciding guilt or innocence on the merits where the insanity defense is raised in the same proceeding (see *People v. Robinson* (1981), 102 Ill. App. 3d 884, 890, 429 N.E.2d 1356, 1361), we note that in this case defendant raised no defense on the merits. Defendant contends, however, that there are two criteria for the court to consider in determining whether to allow bifurcated proceedings: (1) whether the defendant raised an independent affirmative defense in addition to insanity and (2) whether the prosecution's proof of the commission of the act is weak. Since defendant did not raise an independent affirmative defense, he points to the absence of any eyewitnesses and the apparent absence of any motive, and he argues that in this case the prosecution evidence was weak. We disagree. Although no one actually saw defendant stab the victim, there was substantial circumstantial evidence of defendant's guilt. We conclude that the court did not err in denying defendant's request for a bifurcated trial or separate juries.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA, P.J., and McGILLICUDDY, J., concur.