**Evelyn L. DIXON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 86–1480.**

District of Columbia Court of Appeals.

Argued March 8, 1989.
Decided Oct. 18, 1989.

Bruce Clarke, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Kevin A. Forder, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed and Helen M. Bollwerk, and G. Paul Howes, Asst. U.S. Attys., were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and MACK, Associate Judge, Retired.*

---

* Judge Mack was an Associate Judge of this Court at the time of argument. Her status changed to Associate Judge, Retired, on October 1, 1989.

SCHWELB, Associate Judge:

Evelyn Dixon appeals from her conviction by a jury of voluntary manslaughter while armed, in violation of D.C.Code §§ 22–2405, 22–3202 (1989). Her prosecution followed the stabbing death of her husband, Charles Dixon, after Mr. Dixon, apparently under the influence of alcohol and PCP, had swung a steel pole in a destructive and allegedly threatening manner. Ms. Dixon acknowledged at trial that she had stabbed her husband. She denied intending to kill him, however, and contended that she had acted in self-defense.

Ms. Dixon's sole claim on appeal is that she was denied a fair trial as a result of alleged prosecutorial misconduct. Several of her contentions are made for the first time in this court. The trial judge, who was in the best position to assess the dynamics of events in the courtroom as they unfolded, and who candidly revealed that he would have voted for acquittal if he had been the trier of fact, found the prosecutor's performance at the trial, as well as that of defense counsel, to be exemplary.[1] We conclude that if anything was said or done in the heat of battle that would better have been left unsaid or undone, Ms. Dixon was not thereby denied a fair trial. Accordingly, we affirm her conviction.

## I

## THE EVIDENCE

This case presents a particularly poignant illustration of the consequences of drug abuse on citizens of this community. As a result of irrational and assaultive conduct following his ingestion of PCP and alcohol, a young father is dead at the hands of his pregnant wife. Sadly, the life of a young mother with a previously spotless record has been interrupted by incarceration and by tragedy from which she will doubtless find it difficult ever to recover. Any humane judge can sympathize with Ms. Dixon in view of the tragedy that has befallen her and her children. The issue before us, however, is not sympathy. Rather, we must decide whether Ms. Dixon's conviction was secured in violation of her rights.

### A. The government's case

Although different witnesses gave different accounts of exactly what occurred as the events leading to Charles Dixon's death unfolded, the government adduced evidence which, if believed by the jury, established the facts described below. In the afternoon of October 19, 1985, Mr. Dixon, having used both PCP and alcohol, became agitated and began to behave in irrational fashion. He accused his wife of having an affair with a neighbor's 22–year-old brother. In furtherance of these accusations, he apparently punched Ms. Dixon in the mouth and subjected her to other physical abuse. Ms. Dixon denied the accusation of infidelity. She eventually requested residents of a nearby apartment to come home with her and to support her denials. Two of the neighbors accompanied Ms. Dixon, and several other people, who had been "partying" nearby, joined the group at the Dixon apartment after they heard some commotion. Ms. Dixon's mother, Lossie Hart, was also there.

Ms. Dixon asked one of the neighbors to tell her agitated husband that she had not had an affair. Mr. Dixon, however, reacted by ordering the neighbor out. He produced a steel pole from behind the door. He held the pole like a baseball bat and then began to wave it about, knocking off the corner of a coffee table. He next swung the makeshift weapon in the direction of Ms. Dixon and her mother. The mother picked up a chair, but Mr. Dixon promptly knocked the chair out of her hand with the pole. Although precisely what happened next is sharply disputed, there was government evidence that Ms. Dixon, who had previously picked up a butcher knife, warned her husband not to "do anything to make me have to hurt you." Mr. Dixon continued to swing the pole at the furniture, however, and his wife lunged at

1. Specifically, the judge said: "I want to say to ... all three counsel ... that I think it's the finest case I've seen tried.... You were all professionals. You acted it. And you ought to be commended for the way you tried this case."

him and stabbed him through the heart. She inflicted a wound five to six inches deep, and Mr. Dixon died shortly thereafter.

Later in the evening of the stabbing, Ms. Dixon gave a detailed statement to a homicide detective. She described her husband's false accusations of adultery, his substance abuse, and his assaultive conduct towards her on the day in question and on previous occasions. She gave the following description of the events immediately preceding the stabbing:

Then I told my mother about he threw me in the hallway by the closet and [she] told him not to put his hands on me again.

That's when he went over behind the door and grabbed this iron pole that was in the corner and started to swinging it at me and my mother. That is when I went into the back and got the kitchen knife.

He was standing by the window in the living room with the pole held back as if to hit my mother. And I told him if he hit her I was going to stab him with this knife.

So he went over by the door with the pole and asked Hope to leave. Hope said she thought he wanted to ask her something and he kept telling her to leave. And I told her she didn't have to leave because I was the one that told her to come up there.

And he took the pole and tore off the end of my coffee table. Me and my mother both told him to stop going around tearing up stuff. So he started swinging the pole again at me and my mother. And instead of hitting us, he put holes in the wall, tearing up the dining table and chairs.

Then he swung at my mother again and missed and hit the wall. Then I went up to him, standing with the knife pointed in his face, and told him if he hit my mother or tear up anything else in the house, I was going to stab him just as sure as my name is what it is tonight.

After describing further unsuccessful efforts by some of those present to calm her husband down, Ms. Dixon continued as follows:

Lee–Lee, Hope's sister, told him to give her the pole because he did not need the pole, but he wouldn't give it to her. He wouldn't give it to her.

Then he took the pole and hit my coffee table. That's when I went over—that's when I went over there and stuck the knife in him.

She related that at the time when she stabbed Mr. Dixon, "he was holding the pipe down because he had just hit the table with it."

### B. *The defense case*

At trial, Ms. Dixon testified in her own defense. She described how her husband had thrown her against the wall, a closet door, and the bed, and had torn off two of her buttons. Subsequently, during the confrontation that led to the stabbing, her husband threatened, while swinging the pole, to "bust" her head and her mother's head. Although Mr. Dixon never hit her or her mother, he only missed by an inch with three separate blows. Indeed, Ms. Dixon thought that a swing with the pole that struck a table was intended for her. Afraid that her husband was going to kill her,[2] she stabbed him with a knife. She denied that she had intended to kill him. On cross-examination, Ms. Dixon admitted putting the knife next to her husband's face and threatening to stab him "as sure as my name is what it is tonight" if he hurt her mother or broke up the furniture. She also admitted not having told the police that Mr. Dixon had swung the pole at her and missed by an inch immediately before the stabbing.

## II

## LEGAL DISCUSSION

### A. *The legal standard*

Ms. Dixon's appeal being predicated entirely on her allegations of prosecutorial

---

**2.** Ms. Dixon repeatedly acknowledged that neither she nor her mother retreated. She explained that she did not leave the scene because she was afraid that, if she turned her back, her husband would strike her with the pole from behind.

misconduct, we outline the applicable legal principles. We must first determine whether the prosecutor's words or acts constituted misconduct. *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985); *Sherrod v. United States*, 478 A.2d 644, 655 (D.C.1984). If misconduct has occurred, then, viewing the events in context, we must consider the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case. *Hammill, supra*, 498 A.2d at 554. Where the defendant has properly preserved her objections, we must determine

> whether we can say with fair assurance, after all that has happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.

*(Philip) Dyson v. United States*, 418 A.2d 127, 132 (D.C.1980); *Hammill, supra*, 498 A.2d at 554. Where the defendant has failed to object, on the other hand, we will reverse her convictions only if the misconduct so clearly prejudiced her substantial rights as to jeopardize the fairness and integrity of her trial. *Sherrod, supra*, 478 A.2d at 655; *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (*en banc*). The Supreme Court has cautioned that reversal for plain error in cases of alleged prosecutorial misconduct should be confined to "particularly egregious" situations. *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).[3]

We must also bear in mind that an appellate court's assessment of the dynamics of a trial is limited to what can be discerned from a cold record. As we recognized in *Smith v. United States*, 315 A.2d 163, 167

(D.C.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974):

> It is peculiarly within the knowledge of the trial judge whether remarks of counsel during the trial tend to prejudice the cause of a party. The courtroom atmosphere, prior remarks which have provoked the questioned statements, and other factors which cannot be appraised by a reviewing court may render remarks of counsel innocuous, although they may appear viciously prejudicial when removed from their setting.[4]

*Accord, Sherrod, supra*, 478 A.2d at 658 n. 17; *Sherer v. United States*, 470 A.2d 732, 743 (D.C.1983), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984).

Giving due consideration to these principles, we address Ms. Dixon's specific contentions.

## B. *The decedent's shirt*

■ As a result of the stab-wound to his heart, Charles Dixon bled profusely, and his shirt was soaked with blood. Ms. Dixon claims on appeal that during the course of his closing argument, the prosecutor took the shirt out of the plastic bag in which it was wrapped and waved it before the jurors so that they could see the blood. The government responds that "the record belies appellant's claim that [the shirt] was removed from its evidence bag and waved before the jury in an inflammatory fashion." The government further points out that the defense has offered no record citation to establish that this occurred, and that although defense counsel would have been expected to object if the shirt had in fact been waved, no such objection was made during closing argument.[5] It is un-

---

3. In *Young*, 470 U.S. at 16, 105 S.Ct. at 1046, the Court also quoted from *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring), as follows:
   In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.
   470 U.S. at 16, 105 S.Ct. at 1046.

4. This court was quoting from *United States v. Goodman*, 110 F.2d 390, 394 (7th Cir.1940).

5. We note that in her post-trial memorandum in the trial court, Ms. Dixon did not expressly claim that the shirt was taken from its wrapping. She did complain that the prosecutor "waved the proverbial bloody shirt," but it is not clear whether the reference is to a physical waving, as distinguished from what the defense viewed as inappropriate rhetoric.

disputed, however, that the prosecutor adduced testimony about the blood on the shirt from a police officer, and that he referred to the flow of blood in his closing. *See* dissenting opinion at 81, n. 2.

Ms. Dixon did not object to the admission of the shirt into evidence when it was wrapped in the plastic bag. She did object prior to closing argument, however, to the jury's being permitted to take the shirt out of the bag. She moved for a mistrial after the prosecutor's argument, and later for a new trial, based on what she terms the prosecutor's improper appeal to the emotions of the jurors. The trial judge denied all of these motions.

A fatal stabbing is not an antiseptic event which could or should be made to look pretty. Some types of cases, particularly those involving tragic death or injury, have an inherent emotional impact. As the government frequently reminds us, *see Sellars v. United States*, 401 A.2d 974, 977 (D.C.1979), "a criminal trial is not a minuet." *Taylor v. United States*, 134 U.S. App.D.C. 188, 189, 413 F.2d 1095, 1096 (1969) (Burger, J.). The prosecutor need not be a model of "Chesterfieldian politeness," *People v. Fosselman*, 33 Cal.3d 572, 580, 189 Cal.Rptr. 855, 859, 659 P.2d 1144, 1148 (1983), nor is he required to sanitize the government's evidence or make it appear less wrenching than it is. *Powell v. United States*, 485 A.2d 596, 599 (D.C. 1984), *cert. denied*, 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985). Foul blows must be eschewed, but the United States Attorney "may prosecute with earnestness and vigor—indeed, he should do so." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). "Although inflammatory argument may be grounds for reversal, the government should not be restricted to sterile recitation of uncontroverted facts." *United States v. Scott*, 660 F.2d 1145, 1177 (7th Cir.1981), *cert. denied*, 455 U.S. 907, 102 S.Ct. 1252, 71 L.Ed.2d 445 (1982).

The prosecutor may not employ inflammatory tactics or attempt to appeal to the passions and fears of the jurors. *See, e.g., Hawthorne v. United States*, 476 A.2d 164, 170–72 (D.C.1984). Our examination of the relevant portions of the record does not suggest that the prosecutor used unsuitable rhetoric or otherwise acted improperly in relation to the decedent's shirt. In particular, Ms. Dixon has not presented us with a record from which we could reasonably find that the shirt was physically waved in an inappropriate manner. The judge who observed the event, and who personally believed that Ms. Dixon should not have been convicted, detected no inflammatory tactics. The fact of Charlie Dixon's death surely packed a far greater emotional wallop than the blood that was predictably on his clothing. We cannot fault the judge's holding that there was no misconduct, and find no error on the part of the trial court.[6]

## C. *"Sympathy for the victim"*

■ During the course of his closing argument, the prosecutor said:

---

The government's version of what occurred, as stated in its post-trial submission to Judge Beaudin, was as follows:

The government did not wave the shirt, as defendant alleges in her motion. The government first passed the shirt, encased in plastic, to the jury during the trial. Only after defense counsel objected to its admission into evidence, based on the shirt's present condition (ripped apart by medics), did the government fully display the shirt to witnesses and to the jury in closing, explaining carefully how the shirt had been ripped.

Our reading of the record persuades us that it has not been demonstrated that the prosecutor waved the shirt in the manner the defense now suggests. During his argument, he told the jurors: "That's blood. You *will* see it if you take it out of the bag, if you care to."

**6.** Ms. Dixon also argues that the prosecutor's allusion to photographs of her husband taken before and after his death was inflammatory. The government responds that the use of the photographs was necessary to identify the victim, a contention we find unpersuasive since Charles Dixon's identity was never disputed and could readily have been stipulated. Nevertheless, the trial judge found the post-mortem photo inoffensive and not gory, and we conclude that there was no abuse of discretion. *See, e.g., People v. Collins*, 127 Ill.App.3d 236, 240, 82 Ill.Dec. 563, 567, 468 N.E.2d 1343, 1347 (1984), holding that the prosecutor's graphic references during closing argument to homicide victim's shotgun wounds as depicted in photographs were proper argument.

We are here because Charlie Dixon is dead. Charlie Dixon, the man on PCP, the man who was swinging the pipe, the man who is in this jealous rage. But he lived. He had breath. He fathered a son. He will not get to see the son or the daughter across the room from you. They will grow up without Charlie.

Ms. Dixon made a timely objection to what her counsel characterized as a "purely emotional appeal,"[7] and now contends that the prosecutor was asking the jurors to focus upon "irrelevancies which would foster sympathy for the decedent."

There is a logical basis for appellant's complaint. The jury's function in this case was to decide whether Ms. Dixon acted in self-defense. Whether Charlie Dixon's children would or would not grow up without their father was irrelevant to that issue. As the court aptly explained in *Bertolotti v. State,* 476 So.2d 130, 134 (Fla.1985):

> The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.

If a trial were purely a Socratic dialogue, the prosecutor's remarks would be plainly out of bounds. Even in the more realistic and earthier context in which a homicide case is tried, they at least bordered on the inappropriate. A prosecutor should not attempt to elicit a jury's sympathy by referring to the victim's family, either by evidence or in closing argument. *Johnson v. State,* 442 So.2d 185, 188 (Fla.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2182, 80 L.Ed.2d 563 (1984); *People v. Alerte,* 120 Ill.App.3d 962, 968, 76 Ill.Dec. 452, 457, 458 N.E.2d 1106, 1111 (1983), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773

(1985). As the courts in each of these cases recognized, however, every mention of a deceased's family does not, in and of itself, entitle the defendant to a new trial. *Alerte, supra,* 120 Ill.App.3d at 968, 76 Ill.Dec. at 457, 458 N.E.2d at 1111; *Johnson, supra,* 442 So.2d at 188 (brief references to bereaved family members not prejudicial under the circumstances). *See also Macias v. State,* 447 So.2d 1020, 1021 (Fla. App.1984) (conduct of prosecutor in questioning whether murder victim had ever seen his posthumously born child was an "extremely improper appeal to the sympathy of the jury," but harmless).

■ Although, as the court explained in *Bertolotti, supra,* the prosecutor's basic function is to discuss the evidence, not every remark that goes beyond that is necessarily improper. The New York Court of Appeals has found "broad bounds of rhetorical comment permissible in closing argument." *People v. Galloway,* 54 N.Y.2d 396, 399, 446 N.Y.S.2d 9, 12, 430 N.E.2d 885, 887 (1981).[8] A prosecutor may make a "vigorous and forceful" presentation of the government's case. *State v. Zola,* 112 N.J. 384, 424, 548 A.2d 1022, 1043 (1988). He may properly speak of the evil results of a crime. *People v. Jackson,* 84 Ill.2d 350, 360, 49 Ill.Dec. 719, 724, 418 N.E.2d 739, 744 (1981). In a prosecution for distribution of narcotics, he may stress to the jury the seriousness of the charge and comment on the gravity of the nation's drug problem, so long as he does so in a non-inflammatory way. *Malley v. Manson,* 547 F.2d 25, 28 (2d Cir.), *cert. denied,* 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1976); *United States v. Dominguez,* 835 F.2d 694, 700 (7th Cir.1987); and *see Torres v. State,* 754 S.W.2d 397, 401 (Tex.Crim.App.1988) (proper for prosecutor to tell jurors in cocaine distribution case that people die from cocaine, since this is common knowledge). In *People v. Albanese,* 104 Ill.2d 504, 521, 85 Ill.Dec. 441, 448, 473 N.E.2d 1246, 1253

---

7. The trial judge overruled the objection, describing the prosecutor's remarks as "within the bounds."

8. We think that this notion can, however, be carried too far. In *Sutton v. State,* 759 P.2d 235,

237 (Okla.1988), the court put a First Amendment gloss on prosecutors' rights:

> The rule that liberal freedom of speech and a wide range of discussion is proper during closing arguments is elementary....

(1984), *cert. denied*, 471 U.S. 1044, 105 S.Ct. 2061, 85 L.Ed.2d 335 (1985), the court, holding that comments which dwell upon the evil results of crime are proper, found no misconduct in the prosecutor's rebuttal argument in a murder trial which contained remarks, set out in the footnote,[9] which are not so very different from those complained of in the present case. *See also Commonwealth v. Corriveau*, 396 Mass. 319, 337–40, 486 N.E.2d 29, 42–43 (1985) (prosecutor may ask the jury during closing argument to consider the pain and suffering of the victim).

Even if the prosecutor had not elected to mention the subject, the jurors who convicted Ms. Dixon would have known only too well that the Dixon children would grow up without their father. The challenged remarks were truthful, and were phrased in non-inflammatory terms. The court's comments in *Alerte, supra*, 120 Ill.App.3d at 968–70, 76 Ill.Dec. at 457–8, 458 N.E.2d at 1111–12 are instructive:

> Common sense tells us that murder victims do not live in a vacuum and in most cases leave family members behind. *People v. Free*, 94 Ill.2d 378, 415, 69 Ill.Dec. 1, 19, 447 N.E.2d 218, 236 (1983). Here, the jury heard the victim's mother testify regarding her son's life and death. We do not believe that the prosecutor's remarks emphasized the loss to the family to the extent that the jury would, on the basis of those remarks, disregard any evidence which might be favorable to defendant. Thus, we do not believe that the jury's verdict would have been different had the remarks not been made.

Assuming that the prosecutor's comment about the Dixon children having become fatherless had better been left unsaid, Ms. Dixon was not thereby denied her right to a fair trial.

### D. *"Plain error"*

■ Ms. Dixon's remaining contentions[10] were raised for the first time on appeal. They did not occur to the able and conscientious attorneys from the Public Defender Service whose performance at trial made such a splendid impression on Judge Beaudin. Defense counsel having failed to object, Ms. Dixon must show on appeal that the trial judge committed "plain error" by failing to intervene, *sua sponte*, to correct the prosecutor's statements, and that the error prejudiced the fundamental fairness of the trial. We do not believe that Ms. Dixon has sustained her burden.

#### (1) *"Misstating the evidence"*

Ms. Dixon contends that the prosecutor exaggerated and misstated the evidence during his closing argument, particularly with reference to his repeated description of her as "the woman who was not afraid." She complains, among other things, that the prosecutor "improperly resolved the conflict in testimony [between two witnesses] in his favor."[11]

Distortion, like beauty, is in the eye of the beholder. Whether one perceives it often depends on one's perspective. As the Supreme Court explained in *Donnelly v. DeChristoforo*, 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1872–73, 40 L.Ed.2d 431 (1974),

9. In *Albanese*, the prosecutor said:
> Those two women that died, and the one in this matter, Marion Mueller, lived in a retirement village. They were old, for the most part, but they still had a life left to live, they had friends, they had loved ones, they had their shopping excursions and it's not up to anyone to say someone is to die or when that person is to die. It's not up to Charles Albanese to say there's no more life left for those people because he has financial problems, because he can't handle his problems.

*Id.* at 521, 85 Ill.Dec. at 448, 473 N.E.2d at 1253.

10. We have considered all of Ms. Dixon's contentions, including several which are not dis-

cussed in this opinion. None persuades us that her conviction should be reversed.

11. "Characterizing testimony as incredible is an accepted and proper form of comment on contradictory testimony," *(Philip) Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980), at least where the characterization is not an outright expression of the prosecutor's personal opinion. *Logan v. United States*, 489 A.2d 485, 490–91 (D.C.1985). The prosecutor therefore had the right to do what appellate counsel says he did, which may explain why trial counsel did not object and why Judge Beaudin did not intervene.

closing arguments are seldom carefully constructed *in toto* in advance, and improvisation often brings about imperfect syntax and planning. Accordingly, courts should not lightly infer that a prosecutor intends an ambiguous remark to have the most damaging conceivable meaning, or that the jury will so understand it. *Id.* Eschewing the hyper-critical approach against which the Court warned in *Donnelly,* and reinforced by the perceptions of the judge who was on the scene, we do not discern anything in the remarks challenged by the defense which goes beyond reasonable (though perhaps partisan) inferences from the evidence. The judge's routine instruction to the jurors that their recollection controls was, in our view, sufficient to remedy any arguable overstatement.[12]

### (2) *"Misstatement of the law"*

■ Ms. Dixon argues that the prosecutor misstated the law by describing manslaughter as a "criminal mistake." As we read the prosecutor's remarks in context, however, it appears that he was not attempting to trivialize the offense. Rather, he was trying to differentiate between an intentional or malicious homicide (murder) and one which was committed without malice (manslaughter).[13] Consistent with the Supreme Court's observations in *Donnelly,* we should not presume that he intended the worst.

It cannot be gainsaid that the prosecutor's improvised description of manslaughter was imprecise. Defense counsel, however, took advantage of his opportunity during his own closing argument to correct the prosecutor:

> ... the judge will tell you, he's not going to say anything about mistake. He's going to tell you it's a killing where there is no justification.

Judge Beaudin bore out the defense attorney's prediction and gave the appropriate manslaughter instruction. There was no objection. Under these circumstances, "[i]t would be absurd to upset a verdict upon speculation that the jury did not do their duty and follow the instructions of the court." *Graham v. United States,* 231 U.S. 474, 481, 34 S.Ct. 148, 152, 58 L.Ed. 319 (1913) (Holmes, J.).[14]

### (3) *"Improper use of Ms. Dixon's pretrial statement"*

■ At trial, Ms. Dixon claimed that she stabbed her husband because she was afraid that he would kill her with the pole. In her statement to a homicide detective on the night of the homicide, she made no reference to fear for her life. During his closing argument, the prosecutor repeatedly contrasted the two accounts and used the pretrial statement to bolster his description of Ms. Dixon as the lady who was not afraid. Defense counsel did not object.

On appeal, Ms. Dixon contends that the prosecutor was obliged to request permission from the trial judge before arguing that Ms. Dixon's failure to mention fear in her pretrial statement was inconsistent with her testimony in court. She relies, somewhat selectively, on the following passage from *Hill v. United States,* 404 A.2d 525, 531 (*per curiam*), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (D.C.1979):

> The prosecutor, as here, must apprise the trial court of the omitted facts to be relied upon as showing inconsistency and the court must consider whether such facts are sufficiently material that the

---

**12.** Indeed, the prosecutor himself reminded the jurors during his rebuttal argument of their primacy with respect to recollection of the testimony.

**13.** Context is instructive. The prosecutor said, in pertinent part:
> We say manslaughter is not with malice. It is not premeditated. It is a mistake. It is the unjustified taking of a human life. A mistake, but a criminal one.

**14.** Ms. Dixon also contends that the prosecutor mischaracterized her claim of self-defense, and wrongly attributed to her the position that it was "all right" that her husband was dead. We do not think that the prosecutor can reasonably be understood to have meant what Ms. Dixon says he meant. *See Donnelly v. DeChristoforo, supra.* Moreover, the trial judge's instructions as to self-defense were unchallenged and correct.

failure to have mentioned them amounts to inconsistency.

Noting, among other things, that the detective did not ask her if she was afraid, she contends that there was no inconsistency and that the prosecutor's impeachment by omission during his closing argument should not have been allowed.

Ms. Dixon's contention to the contrary notwithstanding, we are satisfied that the plain error doctrine applies. The function of the "plain error" rule is to enable the prosecutor to respond to any contentions raised, and to permit the trial court to fully rule on the issue and thereby to avoid potential error. *See Williams v. United States,* 382 A.2d 1, 7 n. 12 (D.C.1978). If the prosecutor's closing was improper because leave of court had not been secured in advance, a contemporaneous objection could—and should—have been made upon that very ground. The prosecutor could have responded, and the judge could have determined whether leave of court was in fact required and, if so, whether it should be granted on the merits. If the judge had agreed with the defense on both issues— and we believe this to be a substantial "if"—then a timely ruling would have prevented the alleged prejudice of which Ms. Dixon now complains.

In any event, the government has the right during closing argument to comment on the evidence and to draw reasonable inferences from it. *Hammill, supra,* 498 A.2d at 557. In *Hill,* the court indicated that the prosecutor had properly sought and secured the court's permission to use an allegedly inconsistent statement, which was not previously in evidence, *during the cross-examination of the defendant.* Neither *Hill* nor any other authority cited by Ms. Dixon has carried this obligation over to a situation such as the present one, where the pretrial statement has been ad-

mitted as substantive evidence. The government quite plausibly contends that the procedural safeguards established by this court to govern impeachment by omission were created for the purpose of protecting defendants during cross-examination from negative inferences drawn from otherwise incompetent evidence.

We need not decide this issue, however, because we are satisfied that a reasonable assessment of Ms. Dixon's pretrial statement and trial testimony compels the conclusion that there was at least a threshold inconsistency with respect to the role of fear as Ms. Dixon's dominant motivation. Her explanation of the incident to the detective was that she warned her husband that she would stab him if he continued to harass her mother or break up the furniture. The gravamen of this explanation is quite different from a claim that she stabbed Charles Dixon because she feared for her life. A reasonable person might conclude that a woman motivated by the considerations which Ms. Dixon described at trial would not have failed to mention fear for her life in her pretrial statement.[15]

Nor does this conclusion transgress Ms. Dixon's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As this court explained in *Hill, supra,* in a passage that immediately followed the quotation on which Ms. Dixon relies:

Here, where the defendant's post-arrest statement purported to relate what occurred, the prosecutor was properly permitted to show that the defendant had omitted from the version he gave the detective that he had first heard gunshots and that he had not mentioned that Grimes had a gun. In permitting the prosecutor to point out the omission in his story to Detective Dyson of two important facts, there is no criticism of or

---

**15.** Another significant difference between Ms. Dixon's statement to the police and her trial testimony was her failure to include in the former her claim that her husband had missed her with the pole by an inch just before she stabbed him.

It may be appropriate to observe that the prosecutor's having argued that Ms. Dixon's

statement and her testimony were inconsistent did not preclude defense counsel from arguing the contrary. In fact, defense counsel did so, forcefully and in detail. Like many other issues, this one was appropriately left to the jury to decide after each side had its say.

reflection on, the defendant's right of silence under *Miranda.*

As we have noted, the defendant may invoke his right to remain silent at any time. However, he may not purport to relate what happened and later claim that . . . his statement cannot be used to impeach him because it was incomplete. 404 A.2d at 531 (citations omitted). Accordingly, we conclude that the prosecutor had the right to use the pretrial statement as he did, that the trial judge had no obligation to intervene *sua sponte,* and that there was no error or plain error.

### III

The Constitution entitles a criminal defendant to a fair trial, not a perfect one. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 2280, 101 L.Ed.2d 80 (1988). We are all mere mortals, and no prosecutor can spontaneously deliver a perfect closing argument. We agree with the trial judge that Ms. Dixon received the fair and impartial trial which is her constitutional due. Accordingly, the judgment of conviction is hereby

*Affirmed.*

MACK, Associate Judge, Retired, dissenting:

On this record, the government's evidence, taken alone, establishes one of the strongest circumstantial settings for a reasonable claim of self-defense that an accused could hope to establish—a wife and her mother fending off injury from the hands of a husband, crazed by alcohol and PCP, and destructively swinging a steel pole as a bat. The self-defense claim was interposed by appellant from the time of her arrest and renewed at trial. The government's evidence at trial by no means conclusively established "beyond a reasonable doubt" that appellant, in using a steak knife to stab her husband, was not acting in self-defense.[1] *See Bynum v. United States,* 133 U.S.App.D.C. 4, 408 F.2d 1207 (1968), *cert. denied,* 394 U.S. 935, 89 S.Ct. 1211, 22 L.Ed.2d 466 (1969). Moreover, appellant testified unequivocally that she stabbed her husband out of fear that she was in imminent danger of bodily harm. That the jury reached the verdict it did, therefore, in itself speaks to the question of whether the jury was substantially swayed by cumulative prosecutorial misconduct, *see (Philip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980), or whether such conduct so clearly prejudiced substantial rights as to jeopardize the fairness and integrity of trial. *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

I agree with the pronouncement of the majority that the issue before us is not one of sympathy. That is precisely why I find the repeated emotional appeals at trial by the prosecutor to the jury to constitute prejudicial error. In my opinion the parading of the decedent's blood-stained shirt before the jury,[2] where there was no issue whatever as to the cause of death, constitutes grounds for reversal. *Cf. Hawthorne v. United States,* 476 A.2d 164, 170–72 & n. 13 (D.C.1984). The error is compounded by the conduct of the prosecutor in showing photographs of the decedent taken before and after death, where there

---

**1.** The contested evidence as to whether the pole was raised or lowered at the precise time of the stabbing, even if viewed in the light most favorable to the government, is hardly convincing to negate self-defense under the circumstances.

**2.** Appellant states that the prosecutor removed the shirt from the plastic bag and waved it before the jury. The transcript reflects only this:

Dr. Kim came in and told you a downward thrust. You saw the jacket. You got a chance to take a look at it. Let's make it very clear, ladies and gentlemen. This shirt was described as a black and white shirt. You see that it is brown and black. That's blood.

You will see it if you take it out of the bag, if you care to.

And you remember when I showed it to the witnesses it had been ripped and torn. Medics came and you can understand in trying to revive him that this is not the way it was when Charlie Dixon got stabbed.

And you can correspond that with the jacket you were shown where the rip is. Isn't that amazing? One little rip and within 10 minutes all of Charlie Dixon's blood has run out on the floor and he's dead. For what? For a coffee table, two holes in a wall, and three swings.

was no question of identity, and the improper argument that the decedent would not see his children and that the children would grow up without him.[3] The issue is not whether this latter argument was truthful, as the majority suggests, but whether the argument, based upon truths having no probative value, was purely an emotional appeal to the passion, prejudices, and sympathy of the jury—which it indisputedly was. *See id.* at 171–72.

Just as egregious is the prosecutor's explicit and implied misstatement of the law and the facts. He defined manslaughter— at least four different times—as being a "criminal mistake," thus seriously misrepresenting the seriousness of the crime and therefore the incidents that would follow from a conviction. Moreover, he improperly argued non-evidence, created through an "impeachment by omission" technique, without seeking the permission of the trial court. *See Hill v. United States,* 404 A.2d 525, 531 (D.C.1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980). Thus using appellant's statement given to the police during a three hour early-morning interrogation following the crime, the prosecutor argued that appellant's failure to mention her fear at the time of the crime was inconsistent with her testimony at trial that she was afraid, and he referred to her repeatedly as "the woman who was not afraid." The basic unfairness of using this technique is not so much that permission was not obtained (the majority points out the substantive nature of the pretrial statement) but that there simply is no inconsist-

ency which could be used for impeachment or evidentiary purposes. At the time of the pretrial statement, appellant, who had no prior criminal experience, who was recovering from surgery, and who had been battered just prior to interrogation, was asked only to recount what had happened in her own words. Unlike the appellant in *Hill, supra,* she did not omit any important facts as to the circumstances of the crime. She was not asked about "fear"; neither would it have been "natural" for her to have characterized her own emotional response to the violence at this time, *see Hill, supra,* 404 A.2d at 531 (citing 3A J. WIGMORE, EVIDENCE § 1402 (Chadbourne Rev. 1970)). In point of fact, it would not have been "natural" for the police to have asked such a question in view of the circumstances of the crime.[4]

Since all of the evidence supports the fact that a reasonable person, whether afraid or not, would believe she was in imminent danger of bodily harm, I conclude that the overreaching of the prosecutor, in invoking the sympathy of the jury and in misrepresenting the law and the facts, has jeopardized the fairness and integrity of the trial. *See Watts, supra.* I respectfully dissent.[5]

---

3. The prosecutor said:
   We are here because Charlie Dixon is dead. Charlie Dixon, the man on PCP, the man who was swinging the pipe, the man who is in this jealous rage. But he lived. He had breath. He fathered a son. He will not get to see the son or the daughter across the room from you. They will grow up without Charlie.

4. A more basic reason for questioning the prosecutor's use of the impeachment technique to create evidence of lack of fear is that fear is not an element of self-defense. It was only necessary that appellant, under the circumstances as they appeared to her at the time of the incident, actually believed that she was in imminent danger of bodily harm (or to justify deadly force, that she was in imminent danger of death or serious bodily harm), and that she had reason-

able grounds for this belief. *See* Criminal Jury Instructions for the District of Columbia, Nos. 5.13 & 5.14 (3d ed. 1978); *United States v. Peterson,* 157 U.S. App.D.C. 219, 226–27, 483 F.2d 1222, 1229–30, *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973).

5. It is not at all relevant that the prosecutor was acting in the "heat of battle" or that the trial court thought his performance "professional." Indeed one might draw an inference that a sympathetic trial judge stood somewhat in awe of the ability of the prosecutor to prevail in this case. Significantly, in addition to what the majority has recited in note 1, the Court also observed:
   It's of no solace to Ms. Dixon [whom the trial court would have found not guilty] ...

[b]ut I can say that, as far as I'm concerned, I think the government did an unusually diffi-cult job with an unusually difficult set of circumstances.