No. 2--06--0015     Filed: 3-27-08

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--2440 |
| JAMES E. ZOPH, | ) ) ) | Honorable John T. Phillips, |
| Defendant-Appellant. | ) | Judge, Presiding. |

---

JUSTICE O'MALLEY delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, James E. Zoph, appeals his conviction of first-degree murder of a person 60 years of age or over by exceptionally brutal or heinous behavior indicative of wanton cruelty (720 ILCS 5/9--1(b)(16) (West 2004)). Defendant contends that he was deprived of a fair trial by a number of the prosecutor's remarks during rebuttal closing argument and by the publication of certain prejudicially gruesome photographs of the victim. We affirm.

The record on appeal is moderately voluminous. We therefore summarize only those facts necessary for an understanding of the issues raised on appeal and to address those issues. Further factual detail as necessary will be supplied in the analysis of defendant's contentions.

The evidence adduced at defendant's jury trial revealed that, on June 29, 2004, in Zion, Illinois, defendant's aunt, Wanda Walker, was found dead in the home she shared with her sister, defendant's adoptive mother, Betty Zoph. Zoph had adopted defendant when he was about eight years old, and defendant had lived in her home until about 1995, when defendant was in his mid-20s. At the time of her death, Wanda Walker was a 66-year-old woman who was physically disabled. Walker was discovered on the floor in the basement of her split-level ranch home. When she was found, it appeared that she had been severely beaten about the head, neck, and chest. An autopsy performed on Walker showed that the right side of her jaw was fractured, she had bleeding in her brain, the hyoid bone in her neck was fractured, she had petechiae in her eyes, and eight ribs in her upper chest, four on each side, had been broken as a result of the beating she experienced. Further, when Walker was discovered, she had extensive bruising on her face and neck, and the bruising on her face resembled the bottom of a shoe, or a shoe print. The injuries in her throat and the petechiae were consistent with strangulation. Following his examination, the pathologist concluded that blunt-force trauma caused Walker's death.

Police arrived at the murder scene in response to an alarm from the security system installed in the home. Investigation of the murder scene revealed that the glass from a basement window had been removed, apparently to frustrate the alarm system in the home. Above that window, there was a smudged palm print. Comparison of the palm print revealed that it was not defendant's, nor did it match anyone in the home. A sliding glass door was slightly ajar, and the officers used this to gain initial access to the home. The bathroom toilet in the basement had a wad of tissue paper on the bowl, above the water. Later testing of this tissue paper revealed that defendant's DNA was present on the paper.

At about 12:30 a.m. on June 30, 2004, defendant was arrested as he attempted to steal a car from Ramey's Autobody in Winthrop Harbor. Defendant was discovered inside a GM pickup truck, wearing rubber gloves, and with a screwdriver, a multitool, and a wrench in his pocket.

Defendant was interrogated by Waukegan police officer Charles Schletz and Zion police officer Kevin Harris, both of whom are assigned to the Lake County Major Crimes Task Force. Initially, defendant refused to speak or otherwise respond to the officers' questions. After a few minutes, Harris began to read defendant his rights from a preprinted form. Defendant told the officers that he understood his rights and then agreed to give them a statement.

Defendant admitted that he had been inside the Zoph house on the morning of June 29 (this admission may have been prompted by Schletz's statement that the police knew defendant had been in the Zoph house, because they had a witness who had seen defendant leaving the house). Defendant stated that, on June 29, he had just returned from Indiana, having hitchhiked from Evansville to Chicago. Defendant explained that he was in Indiana trying to investigate a will or inheritance and visiting members of his mother and aunt's family who might have had some information for him. Defendant took a train, intending to stop at Zion, but fell asleep and got off the train in Winthrop Harbor. Defendant walked to the Zoph house, where he had grown up. He explained that he had removed the glass from the basement window in order to bypass the alarm system. He was in the basement looking for papers or documents related to the will or inheritance he was investigating. Defendant told police that he was wearing a black T-shirt adorned with a Maltese cross and also had black gloves and a duffel bag with some tools. Defendant was searching in the basement when Walker came downstairs and discovered him. Walker asked defendant what he was doing, and so defendant was not able to keep looking for the papers. Defendant made as if

to walk past Walker. As he was passing Walker, defendant grabbed her in the crook of his arm and began choking her. He continued to choke Walker until he believed she had passed out. Defendant laid Walker down on the floor and resumed his search. While defendant was searching, Walker sat up. Defendant "instinctively" kicked her in the head and Walker fell back onto the floor. Defendant again resumed his search and Walker again sat up. Defendant "panicked and lost it." Defendant admitted that he "kicked her, choked her neck with one hand and stomped her with [his] foot several times until she stayed down." Defendant became frightened and fled the house, setting off the alarm system. Defendant admitted that he knew he set off the alarm, and he ran along the alley behind the house, then headed through Beulah Park and into the woods. In the woods, defendant threw away the gloves and his T-shirt, and he discarded his duffel bag under some power lines on the east side of Sheridan Road. Defendant then circled the woods four times in order to throw off any bloodhounds that the police might employ to track him. In the evening, he visited a friend to get a screwdriver and then made his way to Ramey Auto, where he tried to steal a car.

During the interrogation, defendant attempted to explain where he had discarded his gloves and T-shirt. Defendant suggested he could show the officers better than he could explain, so the officers and defendant traveled to Beulah Park. The officers had called for evidence technicians to meet them at the park. There, defendant walked the officers to the approximate location where he had discarded his clothing. The officers instructed the evidence technicians to search for the items of clothing and returned defendant to the sheriff's department in Waukegan. The evidence technicians recovered the gloves and the T-shirt.

The officers further testified that, after relating the above events verbally, defendant agreed to provide a handwritten statement. Defendant was then left alone for about 30 minutes, during

which time he completed a handwritten statement on paper the police provided; the statement contained the same facts set out above. In addition, defendant wrote that he traveled to Evansville to gather information about a will or inheritance purportedly left him in 1992. Defendant wrote that he entered the Zoph house to look for "papers that could prove [his] fraud case." Defendant wrote that he entered the lower level and began "looking for a room that you have to get to through the crawlspace." After defendant completed his handwritten statement, the officers asked if defendant was willing to be videotaped reading his handwritten statement, but he declined. At some point in the evening, the clothes that defendant was wearing at that time were collected to be examined as potential evidence. A reddish stain was noticed on the cuff of defendant's pants. Further analysis subsequently revealed it to be Walker's blood.

During the trial, the State sought to introduce graphic photographs taken during Walker's autopsy: exhibits 28 through 32, 34 through 36, and 38 through 39. Defendant objected to those photos being shown to the jury. The State responded that the photos were needed to establish the exceptionally brutal and heinous nature of the crime for the purpose of the sentencing enhancement. The trial court considered the arguments and ruled that the probative effect of the photos substantially outweighed their prejudicial effect. However, the trial court ruled that the State could present either exhibit 27 or exhibit 28 but not both. The court also ordered that exhibit 32 be cropped to exclude the victim's brain matter, which had been exposed during the autopsy.

Defendant testified at trial on his own behalf. Defendant had traveled to southern Indiana to speak with his uncle James Walker about two life insurance policies that Wanda Walker had mentioned to him in a letter. Defendant spoke with James Walker for about two minutes and decided that James Walker did not want to help him. Defendant's car was towed while he was in

Mount Vernon, Indiana, visiting with his uncle Paul Walker. As a result, defendant decided to hitchhike back to Illinois.

When defendant returned to the Zion area, he spent the night at the Illinois Beach State Park. When defendant awoke on the morning of June 29, he went to his mother's house because he had nowhere else to go and he was hoping that his mother would drive him to the Lakeville area. Defendant approached his mother's house through the alley behind it, because it was his habit to approach from the alley. When defendant walked along the side of the house, he noticed that the glass from the basement window had been removed. Defendant climbed through the window and found Wanda Walker lying on the floor in the basement. Defendant checked to see if Walker had a pulse, but he found none. Defendant "crept" up the stairs, heard noise and saw movement coming from Walker's bedroom, became startled, and ran out of the back of the house through the sliding glass door, setting off the alarm.

Defendant went to Beulah Park, but testified that he did not walk in circles around the park. He went to a nearby gas station, which was across from a Zion police station, and purchased some soda and candy. Defendant then lay down under some nearby trees and fell asleep. Defendant woke up later in the afternoon. He went to a liquor store and purchased cigarettes and a lottery ticket. Defendant then went to a grocery store and purchased a banana and a package of latex rubber gloves. Defendant explained that he purchased the gloves because he thought he might need to steal a car that evening.

Around 7 p.m., defendant went to a friend's house and borrowed a large screwdriver. Defendant testified that the screwdriver was useful for peeling the steering column of a GM vehicle.

After getting the screwdriver, defendant proceeded to Ramey Auto in Winthrop Harbor in order to steal a car. As he was sitting in a car at Ramey's, the police arrived and arrested him.

Defendant testified that he was taken to the Lake County sheriff's department, where he was interrogated by Schletz and Harris. According to defendant, the police began questioning him about an incident that occurred near his father-in-law's bar. They further asked him if he wanted to write a statement that his father-in-law had murdered Wanda Walker. Defendant was promised that, in exchange for damning information about his father-in-law, he would not be charged and, in fact, would be released.

Defendant testified that he began to write a statement against his father-in-law and filled out the portion that stated he waived his right to consult with an attorney. Defendant changed his mind and asked to see a lawyer before he would continue speaking to the police. Schletz told him that "that wasn't going to happen."

Defendant testified that the police demanded he write a statement about his father-in-law or else they would make it look like defendant had committed the Wanda Walker murder. Defendant reiterated his desire to speak to an attorney, but the police refused. The police then took defendant to the Beulah Park area. There, according to defendant, Schletz got out of the car and opened the trunk. The trunk lid obscured defendant's view, so he could not see what Schletz was doing. After about 10 minutes, Schletz returned to the car and then the police took defendant into a cornfield. They subsequently returned to the station.

Defendant testified that, at the station, Schletz said that he was defendant's only hope to avoid a death sentence or a natural life sentence. Schletz also threatened defendant with being beaten by another prisoner in the jail. Defendant testified that the police prevented him from using the

restroom and from sleeping. Defendant testified that the last time he slept was the previous afternoon, for a couple of hours. Defendant testified that Schletz wrote out a statement and ordered defendant to copy it verbatim. It took defendant about 15 minutes to copy Shletz's statement. Defendant explained that writing and signing the false statement was the only way he could think of to get Schletz "out of [his] face."

Defendant then proceeded to deny the details of the written statement. Defendant also explained that, after finding Wanda Walker in the basement of the house, he did not contact anyone because he was afraid that he would be blamed for the murder.

The parties proceeded to argument. The State's initial closing argument recapitulated the favorable evidence adduced, emphasizing defendant's confession. Defendant's argument focused on defendant's theory that Schletz and Harris pinned the murder on defendant. Defendant argued first that he was not the murderer, pointing out that the police never identified the source of the smudged palm print found near the basement window that apparently had been used to gain entry to the house:

"Now why do we have a problem here? Because the police stopped investigating. They told you that after they got a confession, they didn't follow up. They didn't do anything else. Why does that happen?

I can explain that to you, Ladies and Gentlemen. Because a confession is like a panacea, a cure-all, okay? Any ailments to their case are cured because people believe confessions. It's human nature. You want to believe that you wouldn't confess to something you didn't do. It's against what you think people would do, but we know that historically, people do it all the time. POWs make statements against our country after being held captive, and they don't mean it, but they do it to survive."

Defendant then turned to the authorship and circumstances of the handwritten statement:

"Let's go back and talk about the content or the format of this statement. I am telling you now, and I think you have understood from the evidence that's been elicited, [defendant] is not the author. Detective Schletz told him what to write. Now, without even looking at the exact words, how do we know this to be true? Who here knows how to write a confession? You are not taught that in school. If you take English classes, they teach you methods to have conclusions and introductions. In law school, they pound it into our brains about how we are supposed to break down cases, but there is [sic] no confession courses.

If you think about this in generalities, there is the motive. Let's lead with a motive. So they mention something about a will. Let's talk about your preparation, what is he wearing; what does he bring with him? Let's talk about what happened, so the next section is the action. And then the last portion is the escape. It's perfect. But [defendant] is just told to go in that room and write down what happened. That's an instruction, to write down what happened, and it's supposedly about a murder, so where does he start adding things that are very important to the case that the State wants in this case, in this statement, that the police want in this statement? How does [defendant] know to put it in there if he isn't directed to do that? It's because they told him what to put; specifically, what to write and what to say.

Now, let's talk about some of the things that are in there which are clues to why [defendant] is not the author. There is a statement about this will. It's included in the first section, the motive section. That's important. They want a motive. Now, [defendant] testified there was no will. It was insurance benefits that he was looking for.

Now, you may say: What's the big deal? It's an enormous deal. It's an enormous deal because whose information is it? [Defendant] would have said insurance. He told you that from the stand. Detective Schletz and Investigator Harris would say a will, because they talked to Jim Walker, and he said will. ***

***

*** So why is there a mistake in [defendant's] authored statement? Because he didn't author it. ***

It goes on and talks about gloves and a duffel bag and tools. Now, these gloves, these are not [defendant's] gloves. The origin of these, I do not know, and neither do you, because there has been no testimony as to where they came from. No DNA evidence to prove that they are [defendant's] gloves, even though Kelly Gannon came in here and said you can get DNA off people's clothing. *** No testing. No proof that they are his gloves.

Now, let's jump ahead right to that, because they decide to go off into the woods because they know that apparently [defendant] threw these gloves, discarded them into the woods, and here is a photograph of how they found them. Go to any catalog: Sears, L.L. Bean. This is a great photograph for that. It shows you both sides of the gloves; right hand on the right-hand side; left on the lefthand side; one shows you the palm; one shows you the back. You know just what you are buying. I would like to know what those odds are they chuck these gloves off into the woods through the trees and have them land together.

***

To chuck them into the woods in this manner and for them to land like this. This is a staged photograph for your convenience. Any question about these gloves? You can see the front and the back."

Continuing, defendant argued that he would not have made mistakes in the handwritten statement about what tools he used to open the basement window or about the existence of a room that was accessible only from the crawlspace. Defendant argued:

"So why in the world would [defendant] put [those errors] in his statement knowing [them] to be false? Unless he is giving a false confession. Maybe he is laying the groundwork so you [the jury] will know later that it's not true, or is it because Detective Schletz wrote this and made a mistake? He thought it would be an important clue. It didn't pan out."

Defendant pointed to the language used in the statement, arguing that it was further evidence that he was not the author, and concentrating specifically on how he referred to his relations:

"We get to some language in the statement that says: [']Betty's sister, Wanda Walker, came downstairs.['] ***

***

Use your own common sense, Ladies and Gentlemen, and your own experiences. This is not a natural way for an individual to write about his own experience. It is for someone else when they are telling you to talk about your mother, Betty, or her sister, Wanda Walker. But that is not how [defendant] addressed these people, spoke about them, and that's why we know he is not the author of this statement."

Defendant concluded his authorship argument with contentions that the burglar alarm and his actions after leaving the house did not occur and that defendant omitted things from his handwritten

statement that were significant in the case, like using the basement bathroom (where the police were able to discover defendant's DNA).

Defendant next attempted to explain why he would have falsely confessed in this case:

"[A] person who is down and out; who has no place to stay; who has barely any money; is trying to reach his family; vulnerable; easy prey for detectives; disposable in their minds. They have got a man they can put this crime on if he doesn't give them information. And they squeeze him, and they squeeze him. They don't give him what he wants [sic], so, fine, dispose of him. That's what happened."

Defendant also argued that the timing and circumstances in which his clothes were collected as evidence suggested that the police were trying to make a deal with him:

"[Defendant's] clothing. He is arrested in Winthrop Harbor for this burglary to motor vehicle, whatever, theft. He is wearing the same clothes. They transport him to the major crimes task force, the headquarters; interrogate him, talk to him. He is still wearing the same clothes that he was arrested in. And what is the significance of that? [Defendant] told you they were trying to cut a deal with him. Give us a statement; we will let you go. It's subtle, Ladies and Gentlemen, but why change him into jail clothes at Winthrop Harbor? Why change him into clothes right when you get him? Why collect valuable evidence if you really think he is the murderer and he was just caught the day he murdered somebody? Why not collect that evidence right now because you don't believe he did it? Because you are trying to get him to testify or give statements against someone else, and if he does, you are going to let him go, so why waste the time changing in and out of clothes? Leave him in his

clothes. But when he won't give it to you, that's it. Put it on him; take his clothes, and we are going to shut this case down right on top of him. And that's what they did."

During the State's rebuttal closing argument, the State made the following comments that defendant challenges on appeal as unduly prejudicial and having deprived him of a fair trial. Defendant objected to some, but not all, of the comments as they were made. We emphasize the comments defendant identifies, providing some of the surrounding argument to place them into full context where necessary.

Challenged comment (1):

"The defendant may not be convicted in this case unless you are convinced beyond a reasonable doubt based on the evidence. Evidence. Evidence is credible testimony that you hear from the witness stand. Evidence are [sic] pieces of evidence that are linked, linked to the crime. Evidence is not the guess, conjecture and speculation, flights of fancy of defense counsel." (Emphasis added.)

Defendant's objection to challenged comment (1) was overruled.

Challenged comment (2):

"When we bring you the fact that the defendant's DNA is in the toilet seat--is in the toilet of the bathroom in the lower level at the crime scene in a home shared by two senior citizen women, the toilet seat is up and the defendant's DNA is in that toilet, that is absolutely strong, rock[-]solid evidence connected to this crime.

Compare that with what the defense refers to as evidence. A smudge of a print that matches no one? That's what they would call their evidence? In the rock, paper, scissors of law, DNA that matches the defendant one in ten quadrillionths [sic]--and by the way, you can

stop doing the calculations. You would need 5,166,666 other planet [E]arths to get that many people.

MR. TICSAY [Defense Counsel]: Objection, Judge.

THE COURT: Overruled.

MR. MERMEL [Prosecutor]: When there is only six billion people on the face of the [E]arth, that kind of evidence beats the fingerprint of no one unconnected to the crime every day of the week. When you have the DNA of the defendant at the crime scene with the toilet seat up and no credible way that that can be accounted for by the defendant's version of what occurred, think about that. There is no credible explanation by the defense how his DNA is in the toilet at the victim's home. None. None. That's a pretty big gaping gap in the defense's ridiculous theory." (Emphasis added.)

Defendant's objection to challenged comment (2) was sustained and the jury was admonished not to consider personal attacks on opposing counsel.

Challenged comment (3):

"Once again, in the rock, paper, scissors of law, the defendant's DNA on a piece of toilet paper with the seat up, the chances being one in 31.6 quadrillion at the scene of the crime beats the smudge of a fingerprint that doesn't match anyone that is unconnected to the murder every day of the week. We call that evidence as laughable." (Emphasis added.)

Defendant's objection to challenged comment (3) was overruled, but the jury was admonished again not to consider personal attacks on counsel.

Challenged comments (4) and (5):

"The defense would have you believe that Detective Schletz planted the biker gloves in the woods. Now, I don't know what kind of world that the defense would have you believe we live in, but for you to believe that men so dedicated that they work all day, they go to sleep at one and have to get up at two to start back on the job again, that their main goal is just to grab the first sucker off the street and pin a murder on him? A vicious, brutal, heinous murder? [(4)] Did you see that in the makeup of any of those brave, honorable police officers that testified here? To contend that is so absurd, it's ridiculous.

He already had a ten-pack of gloves. [(5)] I am going to make a couple statements here assuming that anyone believed this wacky conspiracy." (Emphases added.)

Defendant did not object to challenged comment (4). Defendant's objection to challenged comment (5) was overruled.

Challenged comment (6):

"Ladies and Gentlemen, there are three things that brought us all to this space and this time to be together for these several days that we have spent going through this trial and putting on this evidence. Three Cs. One is the crime, the horrible, brutal crime that the defendant committed. The second is him getting caught. And the third is the Constitution of the United States.

The Constitution of the United States provides that any person accused of a criminal act has the right to a trial by jury. That right applies to every man or woman regardless of their race, their creed, their color. It also applies to the strong as well as the weak, and it also applies to the guilty as well as the innocent.

The defendant has a right to force the State to put on the evidence and prove him guilty no matter how overwhelming in fact that evidence is." (Emphasis added.)

Defendant's objection to challenged comment (6) was overruled.

Challenged comment (7):

"Now, a case such as this, in which the evidence is so overwhelming, where you have a handwritten confession; you have DNA linking the victim to the defendant and DNA linking the defendant to the crime, there is a tendency of jurors to think: [']Are we missing something? Is it really that easy? Is it that cut and dry?['] The answer is you have not missed anything; it is that clear, and it is that cut and dry. He simply has a right to make us put on the evidence, and we have done so." (Emphasis added.)

Defendant did not object to challenged comment (7).

Challenged comment (8):

"But the one thing that you must understand about the defendant's testimony is his testimony is judged by the same standards as every other witness; as every police officer; as every civilian witness; as every scientist. His testimony has to stand up to the same type of credibility tests that anybody else's does. I want to make sure you don't confuse that. Credibility, where everybody's credibility is judged the same, with the presumption of innocence. He is not presumed to be more credible than anybody else. His credibility is the same. And if he says things to you that seem preposterous, silly and ridiculous, you are to judge them as such, because they are." (Emphasis added.)

Defendant did not object to challenged comment (8).

Challenged comment (9):

"[D]efendant just happened to show up at his mother's and aunt's house on the day that his aunt was murdered, and I think I wrote the words down in quotes. He said it was mere chance. Well, let's think about that for a second. I harken back to the line in Casablanca where Humphrey Bogart says: [']Of all the gin joints in all the world, she had to walk into mine,['] meaning it's a big world with a lot of gin joints, and this is the one she comes into.

Well, let's think about that. The defendant hadn't been to his mother's house in five years. Five years. That's five years of Mother's Days, Christmases, birthdays, that the defendant hadn't been there. How many days are there in five years? Well, you will find that there is [sic] 1,825. But he wasn't just there on the same day that his aunt was killed. Pretty big circumstantial thing. No he wasn't there just on the same day. He was there in the same hour, within the same minutes, because according to him, her pulse was gone but she was still warm.

Well, not only are there 1,824 other days that the murder could have happened and he wouldn't have been there on the same day, but there are also 43,800 hours where he could have decided to drop by and hop the fence and say hi to mom when the mystery killer wouldn't have been killing his aunt. What awful, awful luck for him to just come during that one hour during the 43,800 hours that happened, during those five years, and he just happens to visit mom on the day the mystery killer kills his aunt. What are the odds of that? What are the chances? Mere chance.

And then he tells you straight-faced that he find [sic] his aunt, who looked like this in life and looked liked [sic] this in death, her face so swollen that it is unrecognizable as being the same person, unrecognizable. He finds a relative of his like this with her face

bloody and beaten, and he tells you he runs and goes and has a snack at a gas station across from the police station. Now, does that seem reasonable? Does that seem likely? As I said, he might have been telling the truth about eating the candy bar, but is that what anybody who would find their aunt in this condition would do? No. To contend that is silly. Maybe when he practiced it in the mirror in the morning it made sense, but it sounded kind of silly in here, didn't it?

Then he tells you he drives 400 miles, and even at pre-Katrina prices, that's some gas being spent there, 400 miles to drive down to see his uncle and talk with him for about all of, what, 45 seconds? Does that seem likely?

And I covered this to some degree. Lake County Major Crime Task Force. You heard officers from Waukegan, Deerfield, Gurnee, Grayslake, Lindenhurst, Sheriff's Office, Zion, Winthrop Harbor, and in many of those situations, the officers were together and doing things together. There is no opportunity for this silly conspiracy. I am not going to say anything more about it. It's just silly." (Emphases added.)

Defendant did not object to challenged comment (9).

Challenged comment (10):

"Now some of you may be overwhelmed with the why. Why did [defendant] do this? Why would anyone do something like this? Well, Ladies and Gentlemen, that is one of the things we have no burden as to whatsoever. There will be no instruction that calls for you to determine why he did this. We only have to prove the who and the what; not the why. And the mere thought of trying to crawl into the mind of a person who would do something so despicable; so violent; so hateful; so grossly, ruthlessly evil as crushing this poor senior

citizen living in her own golden years; to try to plumb the depths of that depravity as to why somebody would be so malevolent and evil to do that type of thing is to look into the inky blackness of the abyss. There is no what [sic, why?] that comes from there. None. To try to figure that out could take you the rest of your life, but the fortunate thing for you is that's not one of the questions on the final exam. You only have to decide the who and the what." (Emphasis added.)

Defendant did not object to challenged comment (10).

Challenged comment (11):

"Ladies and Gentlemen, the defendant's rights have been respected in this case. He has been given his trial by a fair jury of his peers. But the defendant is not the only one who has rights. Wanda Walker had the right to live out her golden years in her home with her sister in the safety and sanctity of her own home. She had the right not to be attacked and bloodied and pulped and killed and savaged and brutalized and have her dignity stolen as well as her life. She had rights, too. You can't give her back her life. You can't even give her back her dignity that he took from her. All you can do is give her justice." (Emphasis added.)

Defendant did not object to challenged comment (11).

Challenged comment (12):

"Lastly, that this was a brutal and heinous murder indicative of wanton cruelty. Well, Ladies and Gentlemen, if being a senior citizen in your own home, padding around in your pajamas, thinking you were safe, and having the last sight that you had on this [E]arth [be] the size ten[-]and[-]a[-]half shoes of this man over there; smashing you in the face; crushing

your neck, breaking your ribs, if that isn't brutal and heinous, indicative of wanton cruelty, it would take a pretty sick person's imagination to think of something much worse.

> What a macabre sight shown in some of those photos. The victim's lifeless bloody and crushed body, that of Wanda Walker, surrounded by a host of stuffed animals and figurines, sitting there in mute testimony to the violence and mayhem that occurred just moments before. What a horrible and odd juxtaposition. But that's what the photos show."

(Emphasis added.)

Defendant did not object to challenged comment (12).

The jury found defendant guilty of first-degree murder of a person 60 years of age or older by exceptionally brutal or heinous behavior indicative of wanton cruelty. The trial court denied defendant's motion for a new trial and sentenced defendant to a term of imprisonment of natural life without the possibility of parole. The trial court denied defendant's motion to reconsider his sentence and defendant appeals.

As an initial matter, we note that we must determine whether our jurisdiction over an appeal is proper, even if the parties do not raise the issue. See People v. Gargani, 371 Ill. App. 3d 729, 731 (2007). Here, defendant admits that his motion to reconsider his sentence was filed more than 30 days after he was sentenced. Defendant argues, however, that the State's active participation in contesting the motion to reconsider his sentence without objecting to its lateness revested the trial court with jurisdiction, and hence his notice of appeal was not untimely. (We also note that the State offers no argument contradicting defendant's position.) We agree with defendant's contention regarding revestment. Although there is question as to whether the revestment doctrine remains viable (see People v. Flowers, 208 Ill. 2d 291, 303 (2003) (lack of subject matter jurisdiction cannot

be cured by consent of parties)), this court has consistently maintained that the adverse party's active participation in a proceeding that is inconsistent with the merits of the prior judgment works to revest jurisdiction in the trial court and that a timely filed notice of appeal from that proceeding serves to vest this court with jurisdiction over the appeal. People v. Minniti, 373 Ill. App. 3d 55, 65 (2007); Gargani, 371 Ill. App. 3d at 731-32; People v. Montiel, 365 Ill. App. 3d 601, 605 (2006). Here, on November 7, 2005, the trial court sentenced defendant. On December 9, 2005, more than 30 days after the final judgment, defendant filed his motion to reconsider the sentence. On December 16, 2005, the trial court held a hearing on defendant's motion to reconsider his sentence. There, the State did not object to the untimeliness of the motion. Additionally, the State provided express argument directed against the merits of defendant's contentions in his motion to reconsider his sentence. Accordingly, we hold that the State actively participated without objection in a proceeding that was inconsistent with the merits of the prior judgment, thereby revesting the trial court with jurisdiction. Minniti, 373 Ill. App. 3d at 67. Consequently, defendant's notice of appeal, filed within 30 days of the ruling on his motion to reconsider, vests this court with jurisdiction over defendant's appeal. Minniti, 373 Ill. App. 3d at 67.

Turning to the merits of defendant's appeal, defendant first argues that a number of comments made by the State during its rebuttal closing argument were unduly prejudicial and deprived him of a fair trial. Defendant also contends that the admission of certain autopsy photos was likewise unfairly prejudicial and deprived him of a fair trial.

Defendant first contends that the 12 challenged comments made by the State during its rebuttal closing argument were calculated to unfairly prejudice defendant and resulted in reversible error. Defendant argues specifically that, given the large number of improper comments, one can

infer that the comments were purposeful and, therefore, denied him a fair trial notwithstanding whether the evidence was closely balanced. Defendant further argues that, even if we do not find reversible error stemming from one or more improper comments, all of the errors arising from the improper comments (as well as the improper admission of the autopsy photographs) cumulatively amount to reversible error.

The prosecutor is afforded wide latitude in making closing arguments. People v. Blue, 189 Ill. 2d 99, 127 (2000). In closing arguments, the State is allowed to comment on the evidence and all of the reasonable inferences arising from the evidence. Blue, 189 Ill. 2d at 127. Closing arguments are to be viewed in their entirety; as well, an allegedly improper argument must be viewed in its context within the closing argument as a whole. Blue, 189 Ill. 2d at 128. The regulation of the closing argument is within the trial court's discretion; the trial court's determination of the propriety of remarks made during closing argument will not be disturbed absent an abuse of discretion. Blue, 189 Ill. 2d at 128.

As an initial matter, defendant concedes that he did not contemporaneously object to all of the comments but maintains that they may be reviewed under the plain-error doctrine. The State counters that, where defendant failed to object, the purported error is waived. See People v. Enoch, 122 Ill. 2d 176, 186 (1988) (in order to preserve an issue on appeal, a defendant must both raise a contemporaneous objection and raise it in his posttrial motion). An exception to the application of waiver is the plain-error doctrine, codified in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)).

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of

the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." People v. Piatkowski, 225 Ill. 2d 551, 565 (2007). The first step of the inquiry under the plain-error doctrine is to determine if a challenged comment constituted error. Piatkowski, 225 Ill. 2d at 565. If the comment resulted in error, then we proceed to determine whether either of the two prongs is satisfied: whether the evidence was closely balanced or whether the error affected the fairness of the trial. Piatkowski, 225 Ill. 2d at 566. Our initial task, then, is to determine which, if any, of the challenged comments resulted in error. As we explain below, we find that none of the comments constituted error.

Defendant first argues that challenged comments (1), (3), (5), (8), and (9) were personal attacks on defendant's counsel and on counsel's theory of the defense. In addition, defendant contends that the remarks improperly interjected the prosecutor's personal opinion about defendant's case. We note that defendant did not object to comments (8) and (9) and that they would be reviewable only as plain error. In support of his personal attack/personal opinion contention, defendant cites to four cases. First, defendant cites to People v. Emerson, 97 Ill. 2d 487, 497 (1983). In Emerson, the court held that the prosecutor's repeated statements suggesting that the defense attorneys "had laid down a smokescreen 'composed of lies and misrepresentations and innuendoes' " constituted error. Emerson, 97 Ill. 2d at 497. Further, the court held that the prosecutor's argument, that all defense attorneys try to " 'dirty up the victim,' " was improper. Emerson, 97 Ill. 2d at 498. The court held that these and other improper remarks constituted reversible error because there was no evidence, other than the State's witness's testimony, to connect the defendant with the crime, and thus the determination of the defendant's guilt hinged upon the jury's assessment of the State's

witness's credibility and that of the defendant. Emerson, 97 Ill. 2d at 501-02. While we accept Emerson's pronouncements of the rules of law by which prosecutorial remarks should be judged, as well as its admonitions against disparaging defense counsel and making unsupported allegations that defense counsel or defendant fabricated the defense, we note that Emerson has little applicability beyond the general statements of the law and is factually distinguishable. Here, we do not discern that the State charged defendant or defense counsel with fabricating a defense. Further, there was ample evidence delivered by a number of different witnesses to support the State's case, compared to the single witness in Emerson. Thus, apart from general statements of the law, Emerson offers little guidance for this case.

Defendant also cites to People v. Abadia, 328 Ill. App. 3d 669, 678-79 (2001). In Abadia, the defendant made more than 30 objections to the rebuttal closing argument alone. Abadia, 328 Ill. App. 3d at 680. The court quoted 22 excerpts of objectionable statements made by the prosecutor during the rebuttal argument. Abadia, 328 Ill. App. 3d at 681-83. All of the statements focused on the defendant's purportedly fabricated defense. The court noted that the defendant chose not to testify and that the record contained only the evidence elicited in the State's case-in-chief. The court examined the evidence of record and concluded that it did not support in any way the prosecutor's charge of fabrication, holding, "[u]nless predicated on evidence that defense counsel behaved unethically, the accusations that defense counsel attempted to create a reasonable doubt by confusion, misrepresentation, deception, and fabrication were irrelevant to the defendants' guilt or innocence, improper and highly prejudicial." Abadia, 328 Ill. App. 3d at 683. We find Abadia to be of limited guidance as well because it involved an extremely large number of objectionable statements focused on the issue of fabrication. We do not discern here that the State was arguing that

defendant fabricated a defense; rather, the State was commenting on the weakness of the theory of the defense when all of the evidence was examined. Nevertheless, when reviewing challenged comments (1), (3), (5), (8), and (9), we will keep in mind Abadia's admonition against allowing the prosecutor to make unfounded claims of defense fabrication and of attempts to mislead, confuse, and deceive the jury.

Defendant also cites to People v. Gonzalez, 238 Ill. App. 3d 303, 317 (1992), and People v. Clarke, 245 Ill. App. 3d 99, 106 (1993), for the proposition that a prosecutor is not allowed to express his personal opinion about the defendant's case or to make personal attacks against defense counsel. This principle appears to offer greater guidance with respect to the issues present in this case. In Gonzalez, the State (1) referred to the defendant as " 'this mope out there' "; (2) said of a defense witness, " 'People like that make me sick to my stomach' "; (3) said of the defendant, " 'You know he's the killer ladies and gentlemen, and I ask you to tell him that because I've told him that. He doesn't care what I say' "; and (4) said of defense counsel, " 'You know, I can never understand when a defense attorney gets up here and he preaches for fifteen, twenty minutes that his guy didn't do it, that we didn't have to prove it, and I have no quarrel that this is America and we have to prove people guilty beyond a reasonable doubt.' " Gonzalez, 238 Ill. App. 3d at 315-17. The court found "various improper comments" by the State but concluded that they did not constitute a material factor in the defendant's conviction. Gonzalez, 238 Ill. App. 3d at 318. In Clarke, the State referred to the defendant's theory of self-defense as "garbage." Clarke, 245 Ill. App. 3d at 106. The court found this "unsubstantiated personal opinion of the prosecutor" improper and concluded that, in combination with other errors by the State, the remark materially prejudiced the defendant. Clarke, 245 Ill. App. 3d at 106. With the principles drawn from Emerson, Abadia, Gonzalez, and Clarke in

mind, we turn to the statements defendant particularly identifies as objectionable personal attacks or statements of personal opinion.

In the context of challenged comment (1), the prosecutor was trying to draw the distinction between evidence and argument. That is the thrust of the comment. Its purpose, therefore, is unobjectionable, and the phraseology employed, that defense counsel's argument was "guess, conjecture, and speculation, [and] flights of fancy," is a strident but appropriate characterization of a defense theory that was tenuous by any reasonable measurement. Defense counsel proposed the staggering coincidence that defendant had not visited his mother's house for at least five years but, when he did, he arrived within minutes of Walker's murder and while the murderer was still present in the house. Defendant testified that, instead of summoning help or notifying the authorities, he ate a candy bar and took a nap. The State's comments were an attack, not on defense counsel personally, but on the substance of the defense theory. We find no error.

Challenged comment (3) compared the State's DNA evidence, linking defendant to the scene and the victim, to defendant's argument that the smudged handprint was that of the real killer. The purpose of the remark was to appropriately comment on the weight of the evidence adduced at trial. See People v. Leverston, 132 Ill. App. 3d 16, 37 (1985) (challenged remarks held to be appropriate comments on weight of the evidence presented at the trial). The clear import of the statement is a comparison of the relative weight of the evidence supporting each party's theory of the case, and, as we noted above, the State was justified in sharply criticizing the defense theory, even, as here, to the point of dismissing it as "laughable." We find no error in challenged comment (3).

Challenged comment (5) called defendant's theory of the case "wacky." Defendant's objection was overruled and the trial court did not admonish the jury. As with the prior comments

examined, the State's terminology, though harsh, was warranted.  The tenor of defendant's closing remarks was to create a large conspiracy among the members of the Lake County Major Crimes Task Force, all of whom testified that they were employed by different police departments and did not work together day-to-day. Defendant was unable to point to any independent evidence to corroborate his theory.  We agree with the State that its comment was an acceptable response to defendant's unsupported theory of the case.

Challenged comment (8) was made in the context of commenting on how the jury was to adjudicate defendant's credibility when testifying.  Explaining that a defendant's credibility is judged in the same manner as any other witness (see Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) ("You should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness")) does not constitute error.  The words, "preposterous, silly and ridiculous," do not transmute the comment into error; the prosecutor was forcefully stating that defendant's testimony was to be considered in the same manner as any other witness's testimony. We hold that there is no error attributable to challenged comment (8).

Challenged comment (9) included the prosecutor's use of the word "silly" to describe defendant's testimony about his reaction to discovering Walker's dead body, as well as the argument about the police conspiracy to frame defendant.  Both remarks were proper.  As we noted above, defendant made the improbable claim that, though he was innocent of Walker's murder, his reaction upon discovering her body was not to notify the authorities, but to eat a candy bar and take a nap. We find no error, then, in the first part of the challenged comment.

There was also no error in the second part of the challenged comment, where the prosecutor again stated that the idea that certain members of the Lake County Major Crimes Task Force

conspired to frame defendant was "silly." This, like comment (5), was an appropriate remark on defendant's unfounded theory that he was framed by the police.

Next, defendant argues that challenged comment (2) "unfairly shifted the burden of proof to defendant." In addition, defendant contends that the comment was speculative and based on missing evidence that the State easily could have adduced by asking defendant whether he used the basement toilet when he visited Walker's and his mother's house. Defendant further asserts that the prosecutor's comment that the defense theory was "ridiculous" was an improper personal attack.

We disagree. The latter aspect of challenged comment (2) was yet another acceptable comment on defendant's wholly unsubstantiated conspiracy theory, and we find no error. We also find that challenged comment (2) neither shifted the burden of proof nor was based on evidence that the State should have elicited. Defendant chose to testify. He easily could have explained that he used the toilet at the scene. (Indeed, the obvious inference from the evidence is that defendant used the toilet.) The State was entitled to note that defendant's version of the events did not provide for his use of the toilet.

Defendant next argues that challenged comment (4) was an improper interjection of the prosecutor's personal opinion of defendant's theory of the case, improperly vouched for the credibility of the State's witnesses, and was not based on the evidence. We disagree. Defendant first particularly challenges the State's comment that, "[t]o contend that [the police witnesses framed defendant] is so absurd, it's ridiculous." With the comment in context, the State was effectively arguing that the evidence of conspiracy was manifestly insufficient to sustain defendant's conspiracy claim. This was a proper argument. The State argued that the police officers were dedicated, as seen from the testimony that one of the officers returned to his home at 1 a.m. and received a call to

interview defendant at 2 a.m., an hour later. The State inferred from that fact that an officer who possesses that level of dedication is unlikely to "just grab the first sucker off the street and pin a murder on him." We find this to be a justified inference and supported by the evidence in this case. Accordingly, we hold that this portion of challenged comment (4) was proper argument.

Defendant also contends that the State's comment that the police officers were brave and honorable improperly vouched for their credibility and was not based on the evidence. For support, he cites People v. Rogers, 172 Ill. App. 3d 471, 476-77 (1988), and People v. Valdery, 65 Ill. App. 3d 375, 378 (1978). In Rogers, the prosecutor interjected his opinion into the discussion of the credibility of two police officers. Rogers, 172 Ill. App. 3d at 476-77 ("What can I say about " the officers; "believe me *** they won't get on the stand and lie and make up something"). The court found that this was not the only instance of the prosecutor personally vouching for the veracity of the witnesses. Rogers, 172 Ill. App. 3d at 477. The court held this to be improper. Rogers, 172 Ill. App. 3d at 476-77. In Valdery, the prosecutor stated directly that he believed that the State's witnesses possessed the highest degree of integrity he had observed in the course of his career. Valdery, 65 Ill. App. 3d at 378. The court held this comment to be prejudicially erroneous because it placed the integrity of the State's Attorney's office behind the credibility of the witnesses. Valdery, 65 Ill. App. 3d at 378.

While defendant cites proper authority for the proposition that the State may not personally vouch for the credibility of its witnesses, that authority is inapposite to the comments at issue here. Here, the prosecutor did not personally vouch for the credibility of the State's police witnesses. Instead, he asked the jurors if they observed anything "in the makeup of any of those brave, honorable police officers" that would have led the jury to believe that the officers conspired to frame

defendant for Walker's murder. We discern no personal vouching for the officers' credibility in the challenged comment. We note that "brave" and "honorable" are value-laden words that may imply that a person possessing those characteristics may be less inclined to lie or mislead in his or her testimony. Choosing such adjectives, however, does not place the integrity of the office of the State's Attorney behind the credibility of the witnesses and does not rise to the level of improperly vouching for the credibility of the witnesses.

Defendant also argues that there was no evidence presented to support the State's comment that the officers were "brave" and "honorable." We disagree. The evidence indicated that, when the officers first entered the Zoph-Walker residence, they were unsure whether an intruder was present. The jury could infer from this that the officers were "brave" in confronting an unknown and potentially very dangerous situation. Likewise, we believe that the jury could infer that the officers were "honorable" because they were sufficiently dedicated to be on call virtually 24 hours a day. There was testimony that, after ending his work at 1 a.m., Schletz was called back to duty at 2 a.m. on the instant case. This circumstance would allow the jury to infer that Schletz was "honorable" for honoring his commitments to his profession beyond the normal requirements of a 9-to-5 job.

Defendant next argues that challenged comments (6) and (7) were improper attacks against defendant for exercising his right to a jury trial. For support, he cites People v. Ray, 126 Ill. App. 3d 656, 662-63 (1984), People v. Mulero, 176 Ill. 2d 444, 463 (1997), and People v. Meredith, 84 Ill. App. 3d 1065, 1071-72 (1980). In Ray, the court condemned the prosecutor's statements that the defendant had hidden behind his constitutional rights during the prosecution and, as a result, should be punished for his invocation of his rights to trial and to an attorney. Ray, 126 Ill. App. 3d at 662-63. In Mulero, the court found the State's comment that the defendant's filing of a motion to

suppress statements reflected her lack of remorse for the crime to be prejudicial to her constitutional right to remain silent. Mulero, 176 Ill. 2d at 462-64. The court held that the comment was fundamentally unfair because it penalized the defendant for exercising her constitutional rights. Mulero, 176 Ill. 2d at 462-63. In Meredith, the court condemned the State's argument that the defendant's invocation of the right to counsel was equivalent to an admission of guilt. Meredith, 84 Ill. App. 3d at 1073.

In each of the cases cited by defendant, the crux of the comment was that the exercise of the constitutional right was related to a consciousness of wrongdoing and that the defendant should not be allowed to "get away with it." Here, by contrast, the challenged comments arose in the context of the State's argument that the evidence against defendant was overwhelming. Our supreme court has held that similar argument is proper comment where it is directed at the overwhelming nature of the State's case. People v. Moore, 171 Ill. 2d 74, 103-04 (1996). The State's argument in this case was directed at informing the jury that the evidence demonstrating defendant's guilt was overwhelming and thus was ample to satisfy the reasonable doubt burden of proof. Accordingly, we reject defendant's argument regarding challenged comments (6) and (7) and hold that they were proper comments on the quality and amount of evidence against defendant.

Next, defendant argues that challenged comment (10) was erroneous because it was calculated to inflame the passions of the jury and to depict him as a monster. To support this contention, he cites People v. Williams, 295 Ill. App. 3d 456, 467 (1998), in which the State characterized the defendant as " 'evil, wicked, [and] vicious.' " The court "disapprove[d] of the State's characterization of defendant as evil," explaining that "the prosecution flirts with error when

its closing arguments depict defendants as being evil persons and victims as being good persons." Williams, 295 Ill. App. 3d at 467.

Here, the State did not lionize Walker as a good and pure person, but the State did effectively cast defendant as evil. After rhetorically asking, "Why [did] defendant do this?" and "Why would anyone do something like this?" the State suggested that "to try to plumb the depths of that depravity as to why somebody would be so malevolent and evil to do that type of thing is to look into the inky blackness of the abyss." Intertwined with the suggestion that whoever did the crime was evil was the implication that defendant was evil because he had committed the crime. A prosecutor's characterization of a defendant as a "monster" or an "animal" has been upheld on review where the evidence justified the comment. People v. Burton, 338 Ill. App. 3d 406, 419-20 (2003) (characterization of one codefendant as a "monster" and the other as a "creature"). The State's characterization was supported by the overwhelming evidence of defendant's guilt and of the brutality of the crime. Walker was brutally and viciously beaten to death, her face, neck, and chest crushed under the boot of her murderer. To characterize such a criminal as demonic was justified by the evidence presented in this case.

Last, defendant argues that challenged comments (11) and (12) improperly contained highly emotional imagery about Walker and defendant's mother that had nothing to do with defendant's guilt or innocence. In support, he cites Clarke, 245 Ill. App. 3d at 106, and People v. Hope, 116 Ill. 2d 265, 275 (1986). Clarke offers no guidance other than the general abjuration against making arguments calculated solely to inflame the passions and prejudices of the jury. In Hope, the court noted that references to the victim's family have no relevance to the defendant's guilt or innocence and serve only to prejudice the jury against the defendant. Hope, 116 Ill. 2d at 275. The court also

noted, however, that a crime victim does not live in a vacuum, so the manner in which the evidence of the victim's family is introduced will determine whether it is prejudicially improper. Hope, 116 Ill. 2d at 275-76. In Hope, the State made repeated references to the victim's family throughout the course of the trial, including during opening statements, through the examination of several witnesses, and in closing arguments. The court held this to be prejudicially improper. Hope, 116 Ill. 2d at 277-78.

In this case, defendant does not point to improper remarks concerning the victim's family during opening statements or during the examination of the witnesses. Instead, defendant points to a closing comment that the victim had the right to live without being brutally murdered and that the jury could give the victim only justice in this case. Defendant also points to the prosecutor's statement concerning the murder scene, which he termed a "horrible and odd juxtaposition" between the victim's collection of stuffed animals and the brutality of her murder. We note that the first comment briefly noted that the victim lived with her sister, defendant's mother, and the second comment did not mention the victim's relationship with her sister. Additionally, we note that the circumstances of the crime necessarily involved defendant's family--it would have been nearly impossible (and possibly misleading) for the prosecutor to avoid that fact. When we review challenged comments (11) and (12), we find their focus to be on the facts of the crime and not the irrelevant and unduly prejudicial facts concerning who was left behind by the victim's death. Accordingly, we hold that challenged comments (11) and (12) do not rise to the level that was found impermissible in Hope. Rather, we find the remarks to be closer to those in People v. Alerte, 120 Ill. App. 3d 962 (1983). In Alerte, the defendant complained that the State had, among other improprieties, made remarks about the family of the victim, remarks about the defendant's parents,

and a plea for sympathy for the victim. Alerte, 120 Ill. App. 3d at 969. The court reviewed the comments and concluded that they did not emphasize unduly or improperly the loss to the victim's family such that the jury would have disregarded any evidence favorable to the defendant. Alerte, 120 Ill. App. 3d at 969. Likewise, the court concluded that the remarks about the defendant's parents and the plea for sympathy for the victim were either justified by the evidence or immaterial to the guilty verdict. Alerte, 120 Ill. App. 3d at 970. As in Alerte, we hold that challenged comments (11) and (12) did not unduly emphasize the victim's family or its loss and that they could not have caused such indignation and anger in the jury that it would have ignored any evidence favorable to defendant. Accordingly, we hold that challenged comments (11) and (12) were not error.

At the outset of our analysis, we stated that we needed to determine if the comments were erroneous before proceeding to determine whether either of the two prongs of the plain-error rule was satisfied. Paitkowski, 225 Ill. 2d at 565. As we have determined that none of the comments constituted error, our inquiry need go no further.

Defendant's remaining contention is that he was denied a fair trial by the erroneous admission of certain unduly gruesome autopsy photographs. Defendant argues that the prejudice accruing from the photos greatly outweighed their probative value and that the State used the photographs to make improper closing argument that served only to inflame the passions of the jury. We disagree.

The decision whether to admit photographs of the victim into evidence is at the discretion of the trial court, and the trial court's determination will not be disturbed absent an abuse of discretion. People v. Bounds, 171 Ill. 2d 1, 47 (1995). Photographs of a victim, even though gruesome, may be properly admissible if they are relevant. Bounds, 171 Ill. 2d at 47. Photographs of a victim may be admitted to show facts relevant to the State's case, like the nature and extent of

the victim's injuries, the condition or the location of the body at the crime scene, or the manner or the cause of death, or to provide details to corroborate the defendant's confession. Bounds, 171 Ill. 2d at 47. Further, the State is not precluded from proving every element of the charged offense and every fact relevant to that proof, even if the defense is willing to stipulate to certain facts. Bounds, 171 Ill. 2d at 46. Finally, if the challenged photographs are relevant to prove facts at issue and if the probative value of the photographs outweighs the possible prejudice, then the photographs will be admissible even if they are gruesome, inflammatory, or disgusting. People v. Mercado, 333 Ill. App. 3d 994, 1001 (2002).

Here, defendant objected to certain photographs as being so shocking that the mere sight of them by the jury would unfairly prejudice it and prevent it from dispassionately evaluating whether the crime was committed in an exceptionally brutal or heinous manner indicative of wanton cruelty. In other words, defendant asserts that the pictures themselves would foreclose any possible result other than a finding that defendant acted in an exceptionally brutal or heinous manner. In light of defendant's argument, the trial court considered all of the photographs tendered by the State. The trial court carefully evaluated the photographs and accepted the State's argument that they were necessary to help the jury understand the testimony of the pathologist who conducted the autopsy and to demonstrate the extreme force used in the attack on the victim. The trial court ruled that the photos were necessary evidence to allow the State to prove the element of brutality it had charged. The trial court held:

"I understand why the State wants to use [the photographs] and I understand the defense's objection as well. Certainly the photographs are graphic, and while they do show injuries, the State does have the burden of proof in this case in the way they have charged it, and I find

that the probative value of these photographs in light of the evidence established by the State does outweigh the prejudicial effect."

However, the trial court ruled that exhibits 27 and 28 were cumulative and limited the State to presenting one of those photographs to the jury. The trial court further ordered that exhibit 32 be cropped to eliminate the autopsy procedure of peeling the victim's skull but to preserve the probative value of the photograph, namely, the damage caused by the attacker. Thus, the trial court limited the photographic evidence that would be shown to the jury.

We find that the trial court carefully considered and balanced the probative value of the photographs against their prejudicial effect. After limiting the evidence as noted above, the trial court reasonably held that the photographs were necessary to help the State to explain the pathologist's testimony as well as to meet its burden to prove the brutal and heinous nature of the crime. Accordingly, we hold that the trial court did not abuse its discretion in admitting the challenged photographs into evidence.

Defendant's reliance on People v. Lefler, 38 Ill. 2d 216 (1967), People v. Fierer, 151 Ill. App. 3d 649 (1987), and People v. Landry, 54 Ill. App. 3d 159 (1977), is misplaced. In Lefler and Landry, the court held that the trial court abused its discretion in admitting photographs, because they were taken during the autopsy, the victim bore little superficial evidence of injury, and the gruesomeness of the photographs was caused by the autopsy procedure and not the crime itself. Lefler, 38 Ill. 2d at 221-22; Landry, 54 Ill. App. 3d at 161-62. Similarly, in Fierer, the court found an abuse of discretion both because the cause of death was not in issue and because the gruesomeness of the photographs was due to the autopsy procedure and not any action of the defendant. Fierer, 151 Ill. App. 3d at 657.

Here, by contrast, the autopsy photographs admitted into evidence demonstrated the extent of Walker's injuries at the hands of defendant. Her body bore extensive evidence of the force and nature of the attack, and this was revealed in the photographs. The trial court excluded a portion of one photograph to shield the jury from the autopsy procedure revealed in that photo. Thus, probative evidence was revealed by the photos, and their gruesome nature was a result of the ferocity of the attack and not the autopsy. Further, autopsy photos were necessary to reveal further aspects of the violence and brutality of the attack, which were not evident upon superficial inspection. Lefler, Fierer, and Landry, therefore, are all distinguishable and do not support defendant's contention. See People v. Pace, 225 Ill. App. 3d 415, 428 (1992) (distinguishing Lefler and Landry on the basis that they disapproved of photos that depicted the results of the autopsy and not the wounds inflicted during the course of the crime).

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

BYRNE, P.J., and ZENOFF, J., concur.